THE PEOPLE *ex rel.* Baldwin and Jaycox *vs.* ROBERT T. HAWS, Comptroller of the City of New York.

Where parties *agree* to submit to arbitration any matters in controversy, such arbitration can be sustained, because it is the voluntary act of the parties; but where the law *compels* a party to arbitrate, upon a claim which properly should be the subject of an action, without his assent, such law deprives him of the right which is secured by the constitution, of a trial according to the course of the common law.

The legislature has no right to direct a municipal corporation to pay a claim for damages for breach of a contract, out of the funds or property of such corporation, without a submission of such claim to a judicial tribunal.

Accordingly *held* that the provision in the act of April 16, 1860, (*Laws of 1860, p.* 774,) for the appointment of arbitrators for the purpose of adjusting and determining the damages of the contractors to whom certain gate houses and aqueducts were awarded by the Croton aqueduct board on the 27th of October, 1858, which they might be equitably entitled to recover of the city of New York, was in direct violation of the provisions of the 1st and 6th sections of article 1 of the constitution.

As the award of arbitrators appointed under that act can be enforced by an action thereon, if the same is valid, the writ of mandamus will not be granted, against the comptroller of the city of New York, to compel the payment of such award.

It seems that a mandamus should also be refused on the grounds that the moneys in the city treasury can only be used for the specific purposes to which they are appropriated; that other officers besides the comptroller must unite with him in the payment of moneys belonging to the corporation; and that the validity of the statute is at least doubtful.

THE Croton aqueduct board, having advertised for proposals for building the gate houses in the new reservoir, duly awarded the contract therefor to the relators, who were the lowest bidders. But the common council refused either to confirm the award to the relators, or to make an appropriation therefor. The relators then caused proceedings to be taken against the city, upon which an injunction was obtained, restraining the corporation from making a contract with any other person, and to compel the execution of a contract with them. In both of these proceedings they were defeated; this court deciding that they had no right to a contract, and no claim against the corporation. Subsequently, and on application of the city, and of said Croton board, and

while the city was under such injunction, the legislature passed a law for the benefit of the city, and also thereby appointed a tribunal, an arbitration, to decide what damages the relators were equitably entitled to against the city, on account of the premises. (*Laws of* 1860, *p.* 772, § 4.) On the 17th of April, 1860, Fernando Wood, as mayor of the city, chose an arbitrator under said act; another was chosen by Baldwin and Jaycox, and the two appointed chose a third, who subsequently met and awarded to Baldwin and Jaycox the sum of $61,821, as the damages to which they were equitably entitled. The award was filed with the clerk of the county of New York, and an order of confirmation was entered and a certified copy thereof was presented to the comptroller of the city, and a demand made upon him for a warrant and payment. The comptroller declined to draw his warrant for such sum and pay the same. An application was therefore made, at a special term, for a mandamus, to require the comptroller to draw his warrant for said sum and pay it. The motion was denied, on the ground that no money had been appropriated by the city for that object. The following opinion was delivered by the justice at the special term.

LEONARD, J. "Without referring to the constitutional validity of the law of 1860, under which the relators apply, or to any of the objections raised by the defendant as to the manner in which it was executed, or to the merits of the relator's demand, it appears to me a sufficient answer to this application that the relators have not made it appear that there has been raised any sum of money, by tax or otherwise, with which the comptroller can pay the said sum. On the contrary, the comptroller states, by affidavit, that nothing has been raised for the payment of this demand, and no appropriation therefor has been made, and he has no money as such officer out of which he can pay the said sum. The money against which the comptroller is authorized or per-

mitted to draw his warrants, now in the city treasury, has been raised by taxation, under specific appropriations for certain defined purposes. It is especially provided by chap. 293 of Sess. Laws of 1861, § 5, that none of the money appropriated for specified objects shall be applied to any other. The comptroller has no money which he can apply to the demand of the relators, without violating this law. The money should be appropriated and raised by law, for the payment of the relators, if the legislature deem it proper to require the comptroller to pay them. When the law has required the people to raise the money, and the tax has been levied, then the comptroller will owe to the relators a direct duty to draw his warrant and pay them.

I think there must be further legislation before the peremptory writ of mandamus can be issued; or the relators must proceed by action to obtain and enforce the collection of their demand by judgment at law.

The motion is denied, with $10 costs of opposing.

The plaintiffs appealed.

*L. R. Marsh,* for the appellants. I. The act of the legislature of 1860 is constitutional and valid. The legislature appointed the tribunal of arbitration to determine the amount of the equitable claim of the relators, and then, by ordering the comptroller of the city of New York to pay it, imposed such amount as a tax upon the city. (1.) This the legislature had a perfect right and power to do. This was held by the supreme court and court of appeals in the case of the *Town of Guilford* v. *Supervisors of Chenango,* (18 *Barb.* 615; 3 *Kern.* 143.) In that case the legislature had appointed a tribunal of three persons, (called there commissioners, instead of as here arbitrators,) to determine the claim of Cornell and Clark against the town, for certain expenses. (*Laws of* 1852, *p.* 12.) These commissioners were there all to be chosen by the county judge, instead of as here by the parties, mutually. The commissioners made their award.

The People *v.* Haws.

The town of Guilford brought the action to restrain the levy of the tax to pay the award, and to prohibit the claimants (Cornell and Clark) from attempting to collect the award, on the ground that the law was unconstitutional and void. So the question was distinctly presented. (18 *Barb.* 615.) The supreme court, at general term, upheld the law most emphatically, giving a very full and elaborate consideration to the subject. The court of appeals (3 *Kern.* 43) affirmed this decision, and sustained the law. The discussions in these two reports exhaust the subject. Again, this question (and several others involved in this case) was brought under the notice of this court, in the recent controversy between McSpedon and Baker and the comptroller of the city. Under a law of 1855 the commissioners of records had made contracts and incurred expenses, and in 1859 made application to the board of supervisors to raise the amount necessary for completion of their duties. The supervisors refused, on the ground that the act of 1855 was unconstitutional. Thereupon the legislature, in 1860, passed a law empowering the supervisors to raise a sum to pay any amount which might be found due to the contractors, and that the comptroller was authorized to pay it when judicially determined. Then, on refusal of supervisors, and before the amount had been judicially determined, application for a mandamus was made and granted, and this was affirmed on appeal. The facts are stated more fully in 11 *Abb. R.* 114. The court held that section 6 of the act of 1860 (like the section 4 of the act of 1860, under which these arbitrators acted,) was a "legislative mandamus." (*Id.* 116.) The court, at general term, said (*pp.* 121, 2:) "The constitutionality of the law of 1855, or the validity of the acts of the commissioners under it, are not before us. We do not undertake to decide, and cannot on this appeal decide, whether any sum whatever, and if any, what amount is due or should be paid to the claimants; and these questions cannot be determined by the board of supervisors, for the reason that the legislature had

referred them for decision to another tribunal." So, in the case at bar, the legislature referred the relators' claim (which was then in dispute and litigation) to a particular tribunal, and the court will not, any more than in the case cited, inquire into it, but act, as it did there, on the acknowledged power of the legislature. In 12 *Abb.* 70, the McSpedon and Baker case again came up, and this court held, (*p.* 71,) "that, as the legislature had not appointed a particular tribunal to decide on the amount, but only said it should be 'judicially determined,' that determination need not be by action, but might be by reference on the mandamus;" and that the constitutional questions could not properly come before the court, on the application for mandamus. And no doubt was intimated as to the powers of the legislature to pass the act of 1860, corresponding with the law in question in our case.

II. But it is urged that the relators, Baldwin and Jaycox, had in reality no legal claim against the city; that though the award of this contract had been made to them by the Croton aqueduct board as the lowest bidders, and they may have incurred large expenses in consequence, yet that such award was not valid or binding on the city till it should be confirmed by the common council; and that as they did not confirm it, no rights accrued to the relators (Baldwin and Jaycox) under said award of the Croton board. We reply : (1.) The question whether the relators had any rights under this award, was a mooted question. They claimed they had. The city claimed they had not. The city claimed the right to award the contract to other parties. The relators caused a suit to be brought against the city, and obtained an injunction against it, prohibiting it from giving the contract to other parties. The city was thus tied up. The litigation was pending, and while pending all parties submitted the matter to the legislature, which thereupon passed this act. Parties to a controversy may submit the same to the legislature, and their act will be binding. Thus, the act of March 11, 1793, (13 *Greenl. Laws, pp.* 81–84, § 16, *ch.* 57,) ap-

pointed commissioners to award and settle the limits as between three different patents ; and the effect of the award came up in the case of *Jackson* v. *Davis,* (5 *Cowen,* 123.) It was conceded to be valid as to all parties assenting or ratifying. The Van Schaicks were not petitioners, and had done nothing thereunder, and the court says (*p.* 135:) " In the absence of *all* proof of a ratification on the part of the Van Schaicks of the proceedings of the commissioners, I should entertain very serious doubts of their being precluded by the award." The same award came up again in *Jackson* v. *Frost,* (5 *Cowen,* 346,) and the court held that the legislature had no power to settle the controversy as to parties not consenting. But here there was not only the submission, the assent at the time, but the conferring of grants upon the city, which they have adopted and had the benefit of. No matter whether the relators here were right or wrong, as to their legal or equitable rights ; that will not be inquired into, any more than, in the above cases under the law of 1793, the court would inquire whether some of the patentees had any rights or not. (2.) But, without such mutual submission, the legislature has the power, on the application of either party, to pass such a law, even where the claim is not in litigation, and is of an equitable or of a doubtful character. Thus the court, in the case cited, (18 *Barb.* 615, 642,) after showing that the town of Guilford could not inquire into the equity of the claim, said : " It is entirely competent for a state to assume and provide for a debt which it is not bound in law to pay, whether decided so or not, and to apportion it upon a portion of its territory, to which it is justly chargeable." And again, at page 644 : " The legislature being the only department of the government that can provide the relief, and being unrestricted in the exercise of their taxing power, except as to the mere manner of passing bills for that purpose, must of necessity be the exclusive judges where the interest or the honor of the government justify a tax, and of what portion of the state ought in justice to pay it." And

in the same case, on appeal, the court say (3 *Kern.* 143-148 :) " The statute book is full, perhaps too full, of laws awarding damages and compensation to individuals who had failed to obtain what they considered equitably due to them by the decision of administrative officers acting under the provisions of former laws. The courts have no power to supervise or review the doings of the legislature in such cases." And again, page 149 : " The legislature is not confined in its appropriation of the public moneys, or of the sums to be raised by taxation in favor of individuals, to cases in which a legal demand exists against the state. It can thus recognize claims founded in equity and justice in the largest sense of these terms, or in gratitude or charity." (3.) The city is estopped from urging any objection against the law, having procured its passage, and having adopted it, acted under it and received its benefits. (*a.*) The law was passed on the application of the city through its Croton aqueduct board. We aver this at folio 5. And it is confirmed by the papers read in opposition to the motion. (*b.*) The act was for the benefit of the city. (*c.*) The city, also by virtue of this act, avoided the injunction which, at the instance of the relators, had been obtained in the name of the people against the prosecution of the work. The city was tied by injunction at the instance of the relators. Meantime the great work was delayed and stopped, and the interest of the vast expenditures then already made was a dead loss. To escape from this predicament the city sought and obtained this law. (*d.*) Besides, independent of the injunction, the city could not proceed without legislative aid ; for Baldwin and Jaycox were the lowest bidders for the work, and so the Croton board awarded it. It could, by its charter, only let the work by advertising for proposals, and then only to the lowest bidders, to wit, Baldwin and Jaycox, and however it might refrain from confirming the award to them, it could not award the job to anybody else. But the act in question (§ 4) authorized it to purchase materials and construct the gate houses,

*by contract or otherwise,* thus modifying the charter and relieving the city from its dilemma. The act, therefore, is a grant to the city, made at its request and on its application, vesting important rights, powers and privileges in the city, not before possessed by it; and as, and in the nature of a condition, it required the city to pay the equitable damages of the relators, sustained, indeed, through this very act, which so enabled the city to avoid their bid, and to build the gate houses in a different manner from that theretofore authorized. Under these circumstances the city cannot repudiate or question the condition; neither that clause which " the legislature has added," nor any portion of the law. They have accepted it as a whole, and completed their gate houses thereunder. They cannot adopt its benefits and repudiate its burdens or obligations. (4.) The city, by asking for and adopting the law, waived all constitutional objections, if any there were. A party may waive constitutional objections to provisions intended for his benefit. (*Van Hook* v. *Whitlock,* 26 *Wend.* 43, *affirming* 7 *Paige,* 373. *Lee* v. *Tillotson,* 24 *Wend.* 337. *People* v. *Murray,* 5 *Hill,* 468. *Baker* v. *Braman,* 6 *id.* 47. *Embury* v. *Conner,* 3 *Comst.* 511. *Tombs* v. *Roch. and Sy. R. R. Co.,* 18 *Barb.* 583.) If the owner of land taken for public use, under color of statute authority, receives damages assessed under the statute, he waives all constitutional objections to the statute. (*Heyward* v. *Mayor &c.,* 8 *Barb.* 486, *affirmed on other grounds,* 3 *Seld.* 314.)

III. It is urged that the plaintiff has a complete remedy by other modes than by *mandamus.* We answer: *First.* This law contains a clear and unqualified direction to the comptroller " to draw his warrant for the amount awarded, and to pay the same." (§ 4.) There is no other mode of compelling him to do this than by mandamus. *The People ex rel. Morris* v. *Edmonds,* (15 *Barb.* 529, 540, 541:) " The claim does not create a debt against the county, which could be recovered in an ordinary action." *Huff* v. *Knapp, chamberlain, &c.,* (1 *Seld.* 65, 67:) " Accounts for county charges

of every description shall be presented to the board of supervisors of the county, to be audited by them. (1 *R. S.* 386, § 4.) This is an imperative direction. The board of supervisors act judicially in auditing and allowing such accounts. Upon being allowed, the county treasurer is to pay them. If the supervisors refuse to do their duty, or if they act improperly in such matters, the appropriate remedy is by writ of mandamus. So, if the county treasurer should improperly refuse to pay, upon the allowance or order of the supervisors, the like remedy may be had against him." *See also id.* 68, 69. *The People ex rel. Downing* v. *Stout, county treasurer of New York,* (4 *Abb.* 25, *note.*) Mandamus issued, and above cases approved. *The People ex rel. McSpedon & Baker* v. *Stout, county treasurer,* (*Id.* 22, 25 ; *S. C.* 13 *How.* 314.) *The People ex rel. Ellis* v. *Flagg, comptroller,* (15 *How.* 553, 4.) *The People* v. *Edmonds, chamberlain,* (19 *Barb.* 468, 472.) A mandamus is the appropriate remedy to compel the county treasurer to pay, when he refuses to pay a demand which the board of supervisors have legally audited and allowed, or directed to be paid. *People ex rel. Kelly* v. *Haws,* (12 *Abb.* 192.) Granted in part. *People* v. *Supervisors of New York,* (11 *id.* 114, 116,) where a somewhat similar act was called (*p.* 116) a "legislative mandamus." *People* v. *Haws,* (12 *id.* 70,) where the mandamus was upheld. *Second.* The defendant being a ministerial officer and representative of a corporation, the proper remedy is by mandamus, even though an action might be sustained. (*McCullough* v. *The Mayor of Brooklyn,* 23 *Wend.* 459–461. *The People* v. *Steele,* 2 *Barb. S. C. R.* 397, 418. *The People* v. *Mayor of New York,* 10 *Wend.* 393.) Though this is questioned by Parker, J. in 1 *Kern.* 573, 574.

IV. The decision of the learned judge below, puts the denial of the motion for mandamus on the ground that " the relators have not made it appear that there has been raised any sum of money, by tax or otherwise, with which the comptroller can pay the said sum," but that the contrary

has been shown by the comptroller's affidavit. We reply: (1.) However convenient and comfortable this rule might be for corporations and individuals, it has no application in the present case. The same legislature which declares by the law of 1861, and by the charter of 1857, that no moneys appropriated by the common council shall be applied to other objects than those named in the appropriation, has, by its equal authority, itself appropriated this sum to this specific purpose. It declares that "*it shall be the duty of the comptroller to draw his warrant for the amount thereof and pay the same.*" This is absolute and imperative; and not dependent upon any appropriation by the common council. It is an appropriation by the legislature. This law of 1861 does not alter the law as it stood before, and is not any broader than the provision of the charter. By the charter of 1857, (§ 31,) it is said, "no money shall be drawn from the city treasury, except the same shall have been previously appropriated to the purpose for which it was drawn." Section 5 of the law of 1861 is a substantial re-enactment of this. But the legislature which imposed this restriction in 1857, saw fit to make the case of the relators an exception; and as a condition of granting certain privileges to the city, itself, made this appropriation in question. This provision of the charter is relied on in the opposing affidavit. The law of 1860, authorizing this arbitration, and appropriating the money from the city treasurer to pay it, by directing the comptroller to draw his warrant for the amount and pay it, is, *pro tanto,* an amendment of the charter of 1857. The law of 1861 (*Sess. Laws,* 1861, *p.* 671, § 5,) does not apply to cases where, by act of the legislature, a special appropriation had been made before. The law appropriating such sum as the arbitrators should award, was passed April 16, 1860, and the contingency upon which it was so to be appropriated, to wit, the confirmation of the report, took place on the 19th day of January, 1861. The statute relied on was passed on

the 17th day of April thereafter. At the time this law was passed, therefore, this appropriation had been specifically made by the legislature itself. There is nothing in the act of 1861, revoking or repealing the act of 1860, making this specific appropriation. The two laws are to be reconciled, if possible, according to the rule of statutory construction, which can only be done, and which can easily be done, by holding the latter law applicable to all cases not provided for by the previous enactment. The evidence does not establish that there is not money in the city treasury applicable to this purpose. The comptroller says there is none that can be *lawfully* taken. That is a question of law, to be adjudged by the court, and not sworn to by affidavit. He says "that said moneys have been otherwise specifically appropriated." It does not very clearly appear *what* moneys he refers to; nor does it appear by whom, or how, the appropriation has been made. It may be that he means by the comptroller, and the mode of such appropriation may be by some unexpressed intention on his part. The law, in any event, only applies to moneys that have been actually appropriated by the common council.

(2.) If the law of 1861 was to be construed so as to overrule and repeal this specific legislative appropriation to the relators, they are, notwithstanding, entitled to the mandamus directing the comptroller to draw his warrant. The law of 1860 makes it his duty to draw his warrant for the amount, and pay the same; that is, furnish the relators with the evidence of their claim, and then pay it. The law of 1861 only applies, if at all, to the latter part, to wit, the actual payment. We are (if not entitled, by reason of there being no money in the treasury applicable to our claim, to present payment, and a mandamus commanding it, nevertheless,) entitled to the warrant, which shall enable us to obtain payment when moneys applicable thereto shall come into the treasury.

*Henry H. Anderson,* for the respondent. I. The law of 1860, so far as it attempts to create an obligation against the corporation of New York, is an infringement upon the chartered rights of the city, and cannot therefore be enforced. (1.) The legislature cannot create a contract which shall be obligatory on the corporation, without its consent. (2.) The legislature has not authorized the raising of the money by taxation, to pay the relators. The act of 1860 seeks to compel the corporation to take its private corporate funds and give them to the relators, who have no legal nor equitable claim thereupon. In other words, the act seeks to appropriate private property for private use, without making compensation. This cannot be done, even when compensation is made. (*Matter of Albany street,* 11 *Wend.* 151. *Matter of John and Cherry streets,* 19 *id.* 659, 675.) (3.) It cannot be pretended that this is an exercise of the taxing power. The distinction between this act and the exercise of the taxing power may be clearly seen from the opinions of the court in the *Town of Guilford* v. *Supervisors of Chenango County,* (3 *Kern.* 143, 148;) and *Lorillard* v. *Town of Monroe,* (1 *Kern.* 392.)

II. If the award made is valid, an action can be maintained thereon against the corporation. If so, a mandamus to the comptroller will not be granted. (*People ex rel. Green* v. *Wood,* 13 *Abb.* 374.)

III. Under the charter of 1857, (§ 31,) the comptroller cannot draw his warrant unless an appropriation has been made, and money is in the treasury to meet the warrant so drawn. There has been no appropriation, and there is no money in the treasury. (*Laws of* 1857, *vol.* 1, *p.* 884, § 31. *The People* v. *Burrows,* 27 *Barb.* 89.)

IV. The act of 1861 (*Laws of* 1861, *p.* 671, § 5,) is a bar to the relators' application.

V. Whether the writ of mandamus shall issue or not, is wholly in the discretion of the court, and it will only be granted to prevent a failure of *justice.* (*Tapping on Man-*

*damus, passim.*)   This case presents no claims to the favorable consideration of the court.   It is simply an attempt to force money from the city treasury; by the interference of the legislature in a matter already adjudicated upon by this court, adversely to any claim whatever of the relators.   The writ was therefore rightly refused.

VI. Should the court entertain the relators' application, the writ issued should be an *alternative* writ.   (*Com. Bank of Albany* v. *Canal Com'rs,* 10 *Wend.* 31.   *People* v. *Board of Supervisors,* 20 *Barb.* 86.   *Col. Life Assurance Co.* v. *Supervisors,* 13 *How. Pr. R.* 309.   *Ex parte Jennings,* 6 *Cowen,* 518.)

*By the Court,* INGRAHAM, P. J.   The relators apply for a mandamus against the comptroller to draw his warrant in their favor for an award made against the corporation for damages sustained by the relators in consequence of the refusal of the common council to award to them a contract for building a gate house at the new reservoir.

This claim arises under the provision of the 4th section of the act passed to facilitate the taking of lands and building such gate house, &c., passed in April, 1860.   (*Laws of* 1860, *p.* 772.)   This section provided, among other things, " that for the purpose of adjusting and determining the damages that the contractors to whom the gate houses and aqueducts, &c. were awarded by the Croton aqueduct board, &c., which they may be equitably entitled to recover of the city of New York, the same may be ascertained by three arbitrators, one to be chosen by the mayor, one by the parties claiming such damages, and the third by the two arbitrators chosen as aforesaid." And the same section, after directing the arbitrators to be sworn to hear the case, and to make their award and file the same with the county clerk, allows an order of confirmation to be entered of course, and then adds : " If such report shall be in favor of the party claiming damages, such party shall be entitled to recover the same ; and upon presenting a certified copy of

such report and order of confirmation to the comptroller of the city of New York, it shall be the duty of said comptroller to draw his warrant for the amount thereof and to pay the same."

In pursuance of this act, three arbitrators were appointed in the mode directed by the statute. These arbitrators proceeded to hear the case. No notice of the hearing was served on the counsel of the corporation, and no appearance was made by him on behalf of the city. Notice, however, was served on the mayor and comptroller. On such hearing the arbitrators awarded, as damages to the relators, $61,821 against the city of New York. The report was filed, order of confirmation entered, a copy of the report and order served on the comptroller, and a demand made of him for a warrant therefor, which he refused, and the relators moved at special term for a mandamus, which motion was denied. The relators appeal from such order.

In order rightly to understand the questions presented in this case, it is proper to remember that this claim is not one against the county, or one which the supervisors have any thing to do with, either as regards the auditing or paying the same. The contract was made, if made at all, in regard to property belonging to the city of New York, was under the direction and control of the Croton aqueduct department, a branch of the city government, and was to be paid for when the work was completed, out of the city treasury. This was expressly held in regard to the work in question. The chancellor says : " The dam and the aqueduct must be considered the property of the defendants, and as the owner of such premises, the corporation of New York is properly answerable for the damage which others have sustained thereby"—and that case (*Bailey* v. *The Mayor &c. of New York,* 2 *Denio,* 433) was decided upon the ground that this work, and the lands taken therefor, belonged to the corporation of the city, and as the owners of property they were liable for any evils resulting from its improper construction or use. The present

claim is one of a similar character, arising out of an alleged contract for work on another portion of the aqueduct, to which the same principles are to be applied.

It is not material, in the examination of the questions which affect this appeal, to decide whether the relators had, by virtue of their offers to the Croton aqueduct board to do the work on the reservoir, acquired any rights which entitled them to damages against the city. Whatever claim of that kind they might have could properly be enforced by an action.

The questions material to the decision of the present appeal are, 1st. Whether the statute providing for the appointment of appraisers was legal ; and 2d. If it was, whether the remedy by mandamus is proper.

The statute which provided for the arbitration directs that it shall be held for the purpose of adjusting and determining the damages which the contractors, to whom the gate houses were awarded, might be equitably entitled to recover of the city of New York, and if an award is made in their favor, directs the comptroller to pay the same.

It must be taken for granted that the intent of the statute was that the comptroller should pay the same out of the city treasury, although the provisions of law are such that he has not the power, without the concurrence of other officers, to draw from the treasury any moneys whatever. No one would suppose, for a moment, that the intent of the legislature was to compel the comptroller to pay such claim out of his own means, and yet in fact such a provision would be no more in opposition to the fundamental law of the state, than to compel the corporation by an act of the legislature to pay a claim for damages, for which they deny any liability, and which has not been adjudged by a legal tribunal to be a valid one.

It is contended by the relators that questions of a similar character have been adjudged in their favor, both in the supreme court and the court of appeals ; and in support of these views they cite the case of *The Town of Guilford* v. *Super-*

*visors of Chenango,* (18 *Barb.* 615, *and* 3 *Kern.* 143,) and the case of the *People* v. *Supervisors of New York,* (11 *Abb.* 114.)

But these cases, and many others of a similar character which might have been cited, related not to the right or power of the legislature to compel an individual or corporation to pay a debt or claim, but to the power of the legislature to raise money by tax, and apply such money, when so raised, to the payment thereof. We could not, under the decisions of the courts on this point made in these and other cases, now hold that the legislature had not authority to impose a tax to pay any claim, or to pay it out of the state treasury—and for this purpose to impose a tax upon the property of the whole state or any portion of the state. This was fully settled in *The People* v. *Mayor &c. of Brooklyn,* (4 *Comst.* 419,) but neither that case nor the case from 3 *Kernan,* 143, in any manner gave a warrant for the opinion that the legislature had a right to direct a municipal corporation to pay a claim for damages for breach of a contract, out of the funds or property of such corporation, without a submission of such claim to a judicial tribunal. In the case last cited Denio, J. says: " The proceeding * * * * is not aimed at and cannot affect the corporate rights or corporate property in the town." Here, however, the act of 1860 directs that the claim of the relators, when adjusted by the arbitrators, shall be paid by the comptroller. This is in direct violation of those provisions of the constitution which say, 1. That no member of the state shall be deprived of any of the rights secured to citizens, unless by the law of the land. 2. No person shall be deprived of life, liberty, or property, without due process of law. (*Constitution of State,* §§ 1, 6. 1 *R. S.* 51, *5th ed.*) Both of these sections have been the subject of examination by the supreme court. In *Taylor* v. *Porter,* (4 *Hill,* 140,) Bronson, J. says: " The words by the law of the land, as here used, do not mean a statute passed for the purpose of working the wrong. That construction

would render the restriction absolutely nugatory, and turn this part of the constitution into mere nonsense." "The meaning of this section seems to be that no member of the state shall be deprived of any of his rights, unless the matter shall be adjudged against him upon trial had according to the course of the common law. It must be ascertained, judicially, that he has forfeited his privileges, or that some one else has a superior title to the property he possesses, before either of them can be taken from him. It cannot be done by mere legislation." And the words " by due process of law" are defined in the same case as not to mean less " than a prosecution or suit instituted and conducted according to the prescribed forms for ascertaining guilt or determining the title to property." And again : " When one man wants the property of another, I mean to say the legislature cannot aid him in making the acquisition." The same doctrines were repeated by Comstock, J. in *Wynehamer* v. *The People*, (3 *Kernan*, 378–393.)

If by " due process of law," and by "the law of the land," is meant a suit instituted and conducted according to the course of the common law, then the legislature, by the passage of the act referring to arbitrators to decide the amount of damages the relators had sustained, deprived the corporation of a right to a trial according to the course of common law, and the provision referred to was in conflict with the constitution.

The conflict which has arisen in this case as to who was appointed arbitrator by the mayor, shows the danger of selecting such a mode of trial, which was not subject to any court, where such a proceeding could be controlled and questions of this character adjudicated. I do not deem it necessary to decide, even if there was sufficient evidence for that purpose, which was the arbitrator properly appointed.

Where parties agree to submit to arbitration any matters in controversy, such arbitration can be sustained, because it is the voluntary act of the parties ; but when the law compels

a party to arbitrate upon a claim which properly should be the subject of an action, without his assent, such law deprives him of the right which is secured by the constitution, of a trial according to the course of the common law.

If, however, the views above expressed as to the constitutionality of this section are doubtful, still I am satisfied the remedy sought in this case is not the proper one. The same section says, that if such report should be in favor of the party claiming such damages, such party shall recover the same, &c. The remedy then could be enforced by an action on the award, if the same was valid. Where such a remedy exists, a party has no right to have the writ of mandamus. It is said the comptroller is directed to pay the amount. But with the knowledge that the moneys in the city treasury can only be used for the specific purposes to which they are appropriated; that other officers besides the comptroller must unite with him in the payment of moneys belonging to the corporation, and with the doubt at least which exists as to the validity of this statute, I think it is clear that the application for a mandamus ought not to be granted. (*See People* v. *Brooklyn*, 1 *Wend.* 318 ; *People* v. *Judges of Oneida*, 21 *id.* 20 ; *People* v. *Supervisors of Chenango*, 11 *N. Y. R.* 563 ; *People* v. *Burrows*, 27 *Barb.* 89.)

The various cases referred to by the relators' counsel on this point, were mainly cases in which the duty of auditing and paying depended on the action of the board of supervisors, and not of a corporation. The board of supervisors can be compelled in no other way, and where the application is to audit an account or to pay when the account has been audited, this remedy is proper. The cases cited from 23 *Wend.* 459, and 10 *id.* 393, as to corporations, were reviewed and disapproved of in *The People* v. *Supervisors of Chenango Co.*, (1 *Kernan*, 563.)

The case of *Green* v. *The Mayor &c.*, (2 *Hilton*, 203,) is an authority for nothing except that a judgment may be recovered against the corporation for a claim for which no

money has been appropriated; and if it has any relation to this case it is to show that the remedy by mandamus is not proper.

The order appealed from must be affirmed with costs.

[NEW YORK GENERAL TERM, May 5, 1862. *Ingraham, Leonard* and *Clerke,* Justices.]