Barbour, J.
(dissenting.) The complaint in this action • alleged that, on the 14th of July last, the plaintiff owned and possessed certain articles of wearing apparel, a sum of money, watch and other chattels, carried on his person, of a certain value, in the aggregate, ($127;) that a mob of rioters then collected in this city, for the space of four days terrified, overpowered, and killed many citizens, openly defied, terrified and overpowered all the public authorities of the city, and destroyed much property ; that on the last named day, while such rioters were lawlessly engaged in pillaging and destroying by fire the preperty in a certain store, and threatening to destroy in like manner the next adjoining premises, which was the house where the plaintiff then resided, he, in the act of passing through such rioters, in order to save his property in such house, was violently assaulted, knocked down, and trampled upon by them, and deprived of all such property, the same “ being carried away from his possession by the said rioters, and in consequence of said mob and riot, being irrecoverably' destroyed, and lost to the plaintiff.” The plaintiff further averred in his complaint, that there was no negligence or want *251 of care on his part; that, on the 31st of July, he presented his claim for damages to the city comptroller, payment whereof was refused ; and he demanded therein judgment for the value of the property, with interest. To that complaint the defendants demurred, upon the ground that the same did not state facts sufficient to constitute a cause of action; the court, at special term, sustained the demurrer, and the case now comes before us upon appeal from the judgment entered thereon.
It is conceded by the learned counsel for the plaintiff, and, indeed, there can be no doubt he is correct, that the latter is not entitled, under the rules of the common law, and without the aid of some statutory provision, to recover in this action against the defendants, the corporation of the city of New York ; but he bases his right to a recovery solely upon an act of the legislature of this state, passed in 1855, (3 R. S. 5th ed. 874,) providing for compensation to parties having property destroyed in consequence of mobs or riots.
The first section of that act declares, that “ whenever any building, or other real or personal property shall be destroyed or injured in consequence of any mob or riot, the city or county in which such property was situated shall be liable to an action by, or in behalf of, the party whose property was thus destroyed or injured, for the damages sustained by reason thereof.” The second section authorizes such actions to be brought and conducted, and the judgments therein appealed from, in the same manner as in other actions; and directs that whenever any final judgment shall be recovered against such city or county, the treasurer of said city or county shall pay the amount of the same to the party entitled thereto, whenever such party shall present to him a certified copy of the judgment roll, and shall charge tho amount thus paid, to such city or county. It is unnecessary to state here any other provisions of such act.
The objections raised by the defendants’ counsel, that the complaint, taken as an entirety, does not show that the property in question was injured or destroyed by the mob, cannot be sustained. The allegation that the property was carried *252 away from the plaintiff’s possession is in no degree inconsistent with the positive averment that it was irrecoverably destroyed. Indeed, the complaint fully and properly sets forth all the facts necessary to constitute a cause of action, if any action whatever can be sustained against these defendants, under and by virtue of the act.
But there are other questions in the case, which, in view of the legal principles involved, and the magnitude of the interests to be adjudicated in this, and sixteen hundred similar cases, already instituted against the city, are of such importance as to demand careful examination and serious consideration.
As the ultimate effect and operation of the statute in question, if the same is valid, must be to compel all the citizens of the city of New York, in a case like this, to pay for such property as has been destroyed or injured by a mob, whether such citizens, or a considerable portion, or, even any of them, were or were not particeps criminis therein, or connected therewith, it can hardly be doubted that such act is not only penal in its character, but, in so far, at least, as concerns the innocent who are thus compelled to answer with their property for the acts and misconduct of others, is in derogation of common right; that right which every man has to keep and enjoy his own property, unless the same shall be taken from him by legal authority.
The rule is well settled that all penal statutes, and all statutes affecting property contrary to the principles of the common law, must not only be expressed in clear and unambiguous language, but must also be strictly pursued in relation to all matters impairing the rights of the person against whom they are designed to operate. (Dwarris on Stat. 749.) It is essential, therefore, that the language of such an act be sufficiently definite and certain, to enable the court to ascertain and determine with precision the person intended to be charged thereby.
The statute upon which this action is founded is, I think, neither wholly penal, nor entirely remedial; but it is to be con *253 sidered as penal so far as it is calculated to effect the rights of. the defendants in the actions therein contemplated, and remedial as to the parties whose property has been destroyed or injured.
In Ratcliffe v. Eden, (Cowp. 485,) it was decided that the statute of 1 George I, St. 2, Ch. 5, which is similar in principle to the act under consideration, was remedial. But, in Reid v. Clarke, (7 T. R. 497,) Lord Kenyon held that it was a penal law. In Hyde v. Cogan, (Doug. 699,) however, Buller, J. in discussing the question as to what property was covered by the act, said : “The statute is so framed that the words might possiby admit of two constructions, and therefore it is material to consider whether it is penal or remedial; because there is a well known difference in the rule of construction as applied to laws of the one sort and of the other. Where they are remedial, the interpretation is to be liberal, so as best to apply to the end. But a law may, certainly, be penal in one part, and remedial in another; and that is the case here.” So, too, in Wilmot v. Horton, (cited in a note to Hyde v. Cogan,) Lord Loughborough, in speaking of the same act, said : “ This statute, though penal in a great part of its provisions, and though, perhaps, there is something of a penal nature in transferring the action from the party committing the felony to the hundred, yet, with respect to the party injured, it must be considered as remedial.” (See also Fish v. Fisher, 2 John. Cas. 89 ; Smith v. Moffat, 1 Barb. 65 ; Millered v. Lake Ont. R. R. Co., 9 Haw. Pr. 86; Sickles v. Sharp, 13 John. 497.)
Holding in view these rules, the first question that rises to the mind is, whether the act, definitely, and with, at least, ordinary certainty, designates the person against whom it is designed to operate ; for if not, it is void for that reason.
The statute in question, it will be remarked, declares that where property shall be destroyed or injured by a mob, &c., the city or county—that is, the one or the other of them—shall be liable for the damage. The legislature have thus, very clearly, expressed their intention that either the one or the other of those two parties shall be liable to pay the damage. This, it *254 seems to me, is insufficient to charge either the city or the county ; for the act fails to designate, in terms, which one of the two is thus to be liable, or to declare that cities shall be held in a certain specified class of cases, and counties in another. Standing by itself, it is void for uncertainty in regard to a most material matter.
But, although a strict construction must be given to the act, according to its letter, for the security of the person to whose prejudice the same is designed to operate, it is, nevertheless, our duty so to construe it as to give effect, if possible, to the intention of the legislature, as embodied in its provisions, (McCluskey v. Cromwell, 1 Kern. 593 ; Waller v. Harris, 20 Wend. 561;) and I know of no reason why the court may not, in examining the question of legislative intention, take into consideration such extraneous facts, within their judicial cognizance, as tend to elucidate such intention.
What, then, was the design of the legislature touching the parties to be charged as defendants, as derived from such facts and the statute itself?
The act is general in its provisions, and was, undoubtedly, intended to operate in the same manner in and upon every city and every county of the state. All the cities in the state, other than the city of Hew York, are included within the bounds and form a part, and only a part, of the counties in which they are, respectively, situated ; but. the boundaries of the- city and of the county of Hew York are precisely the same. The most natural and obvious construction of the act, so far as relates to counties and cities other than Hew York, is, that the same was designed to compel those cities to pay such damages as should be occasioned by the destruction or injury of property by mobs within their respective limits ; while the county, as such, was to be held for such damages only as should be caused within such county, but beyond the bounds of its cities. Unless such was the intention, the provision, in the alternative, that the county or the city might be proceeded agaiust, would be senseless, as well as unjust and unreasonable. It cannot reasonably be imagined, it appears to me, that the legislature designed to *255 impose upon the county, absolutely, and by force of the act itself, the payment of all such damages as should occur within its limits and beyond the bounds of a city, and at the same time, to leave it entirely to the whim or caprice of the party injured to determine whether damages occasioned by a mob in a city should be paid for by such city alone, or by the county at large. There is no supposable reason for giving such optional power to the person injured ; inasmuch as his remedy would be perfect upon a judgment against either.
Is it possible to imagine that the legislators who framed this act, considered themselves less competent to determine whether the city or the county ought to bear the loss, than the person who should have sustained the injury ; and that they designed to leave it optional with such party to charge his damages upon the city or the county, as he might himself elect P The proposition appears to me to be absurd.
It has been said, however, that inasmuch as the boundaries of the city and county of New York are alike, and the citizens of the one are, necessarily, the inhabitants of the other, it is immaterial whether an action is brought against the city or the county, and therefore a different rule of construction should prevail here from that which is applicable to cities and counties in the interior. But I have been unable to discover any distinction, in this regard between the city of New York, and the other cities of the state. The city of New York, precisely like the other cities, as I understand the act, was to be held responsible for such damages as should be occasioned by mobs within its precincts ; and although it follows as a necessary conclusion, that no recovery can, in any case, be had against the county of New York, by virtue of the statute, because the boundaries of such county and of .the city of New York are precisely the same, yet there is no inconsistency whatever in this. The act does not operate upon the county of New York, simply for the reason that there is nothing to operate upon ; no locus in quo ; because it has no territory outside the limits of a city. By its terms, the act is to operate upon every city and every county, in like manner as to each of the class. *256 Besides ; although the boundaries of the city and the county of New York are alike, and their inhabitants are the same, yet the municipal corporation, and the board of supervisors of the county, are not only two distinct persons in the law, but judgments against them, respectively, must be satisfied, eventually, out of property belonging to quite different classes of persons. If, for instance, the' judgments which may be recovered under the act are to be satisfied as therein contemplated, by payments out of the city or the county treasury, as the case may be, then a judgment against the county must be paid out of moneys in the county treasurer’s hands, that have been raised by taxes assessed upon the property of that comparatively small portion of the population known as tax-payers ; while on the other hand, the moneys used in payment of alike judgment against the mayor, aldermen and commonalty, must be taken by the city treasurer out of funds which have been derived in great part, if not entirely, from license fees, rents of wharves, markets, and other property, ferry franchises, &c. and which equitably belong to all of the eight hundred thousand citizens of New York. Or, if the plaintiffs in such judgments shall resort to their legal remedies in collecting the same, independent of the statute in question, a judgment against the city must be satisfied by a sheriff’s sale of a portion of its immense property, in which, as we have seen, each and every citizen has an interest; while payment of a judgment against the county can be enforced, after its small property shall have been exhausted by sales on execution, only by mandamus upon the county treasurer ; or in case he shall have no funds in his hands, then, by a mandamus upon the board of supervisors, to compel them to raise the necessary amount by a tax upon the property of that class only of our citizens who pay taxes.
Again : If the party whose property has been destroyed by a mob, may, at his own option, bring a suit to recover for his damages under the statute against either the city or county, as he shall elect, I see no reason why he may not, if he shall see fit to do so, institute two separate actions, against the city and the county, respectively, and proceed with them, pari *257 passu, to a final judgment in each ; as they are, severally, distinct persons in the law, and neither has any legal concern or interest in actions against the other, and, therefore, could not plead such other suit in bar to further proceedings against itself. Nothing short of a satisfaction of the judgment in the one case, I think, would be a bar to proceedings in the other; and it is unnecessary to pursue the inquiry to see whether even that would be. Surely the legislature could not have designed this. But, as I understand the act, when thus examined in the light of extrinsic facts, it was their intention to subject the city of New York to a liability precisely like those which were imposed upon the other cities of the state, and to compel it to pay such damages as should be occasioned by mobs within its precincts.
I am, therefore, of opinion that the act, irrespective of the further question I am about to consider, is valid, and may be enforced, nothwithstanding the uncertainty in its terms regarding the parties to be charged.
I pass next to the examination of the question, discussed upon the hearing, as to the constitutionality of the act.
Many statutes have been enacted by the English Parliament, at various times, running through a period of several hundred years, such as the statute of Winton, (13 Edw. 1,) the statute of Elizabeth, &c. providing for recoveries in actions brought against the hundred by parties robbed therein, or against cities and towns by persons whose property has been destroyed within the bounds of such municipalities by mobs or riotous assemblages; all of which statutes were, undoubtedly, based upon the theory that it was the duty of such hundreds, cities, &c. (which were clothed with power for that purpose,) to preserve the peace and protect the property of all persons within their limits; that such persons were rightfully entitled to such protection, or to compensation in case of loss; and that a liability imposed by law upon such municipalities or political organizations, in case a robbery was committed or a riot should be permitted to occur, and property to be destroyed or injured, would not only tend to incite them, to greater vigilance. *258 but that the compulsory' payment of the losses so occasioned would be a proper and just penalty for the negligence of which they had been presumptively guilty, (see Ratcliffe v. Eden, Cowp. 485 ; opinion of Lord Mansfield ;) and such, it seems to me, must have been the theory upon which the act of our state legislature was founded. I can imagine no other that could justify the infliction of what is in effect a fine or penalty, upon a municipal corporation, because of damages occasioned by a mob.
But whether the legislature, in passing the act in question, were or were not governed by the reasons which induced the enactment of the English statutes, as above suggested, it is to be remembered that, while parliament is omnipotent in regard to its legislation, ours is circumscribed and controlled by the constitution. By an act of parliament alone, and without the intervention of courts of law, a man may be deprived of his property, and even of his life. But the constitution of this state declares that no person shall be deprived of life, liberty or property, without due process of law, (Const. of N. Y. act 1, § 6 ;) and that of the United States prohibits the passage of any law by a state impairing the obligation of contracts. (Const. U. S. art. 1, § 10.)
The mayor, aldermen and commonalty of the city of New York, the defendants in this action, are a corporation, and, therefore, a person within the meaning of the constitution, possessing and owning, under and by virtue of various grants of lands, rights, and franchises, which are contained in their ancient charters, a large amount of property, real and personal, consisting of such lands, rents and franchises and' the proceeds thereof, and are 'in the annual receipt of large sums of money derived from such franchises, and from the sales and rents of their lands ; all of which property has heretofore been, and now is, held and possessed by such corporation, under and by virtue of a further grant or covenant, also contained in those charters in express terms, that the grantees should have and enjoy the property granted, with the profits thereof, forever, *259 without hindrance or impediment from the grantor. (Dongan’s Charter, §§ 3, 4, 6. Montgomery Charter, §§ 1, 36 to 40.)
This property of the corporation is as sacred, and as free from legislative control, as that of any individual; although its municipal or governmental powers may be, in most respects, restricted or enlarged by the legislature. For, first, those charters constitute a valid contract between the crown of Great Britain and the corporation of New York, which is binding upon their successor, the state of New York, (see Charles River Bridge Case, 11 Peters, 572,) on the one part, and the city corporation on the other. The latter, therefore, cannot be disturbed or molested in their possession and enjoyment of the property covered by the grants, by, under, or by virtue of any act of the state authorities, and against the will of such grantees, without a direct violation of the provision of the constitution of the United States above referred to. Secondly, even were this otherwise, it is sufficient that the constitution of this state, in the section above mentioned, prohibits such legislation.
Chancellor Kent, in his learned and well considered Note 3, on the charters of the city of New York, (City Charters and Kents Notes, p. 202,) says: “ The grant to the corporation was doubtless a valid grant; and the rights of property thereby acquired could never thereafter have been lawfully divested, without the consent and act of the corporation, or due process of law, It may not be amiss to state here, once for all, that it is an acknowledged and settled principle, that no vested right of property, whether it belongs to individuals, or be in the shape of a corporate franchise, can ever be lawfully taken away, without some -default or forfeiture, to be ascertained upon a fair trial, and pronounced by judicial decree.” * * * “ Corporate franchises, in this country, rest on a basis, which ought to be, at least, as solid as Magna Charta, for they are founded on grants which are contracts ; and no state/ says the constitution of the United States, 'can pass any law impairing the obligation of contracts.’ ” (See also Fletcher v. Peck, 6 Cranch, 87 ; Charles River Bridge *260 case, 11 Peters, 592 ; Webb’s case, 8 Co. 92 ; Co. Lift. 2 Inst. 45, 50.)
In Taylor v. Porter, 4 Hill, 140;) Justice Bronson, in discussing the powers of the legislature upon-a similar question, uses this language: “ It is readily admitted that the two houses, subject only to the qualified negative of the governor, possess all the legislative power of the state; but the question immediately presents itself, what is that legislative power, and how far does it extend ? Does it reach the life, liberty, or property of a citizen who is not charged with a transgression of the lazos, and when the sacrifice is not demanded by a just regard for the public welfare ?” * * * “ The security of life, liberty and property lies at the foundation of the social compact; and to say that this grant of legislative power includes the right to attack private property, is equivalent to saying that the people have delegated to their servants the power of defeating one of the great ends for which the government was established).” * * * “ The legislative power of this state does not reach to such an unwarrantable extent. Neither life, liberty nor property, except when forfeited by crime, or when the latter is taken for public use, falls within the scope of the power.” (See also Wilkinson v. Leland, 2 Peters, 657 ; 2 Kent’s Com, 13, 340, and cases cited ; Matter of Albany street, 11 Wend. 149 ; Bloodgood v. The Mohawk & Hudson River R. R. Co., 18 id. 59 ; Matter of John and Cherry streets, 19 id. 659 ; Varick v. Smith, 5 Paige, 137 ; People ex rel. Fountain v. Supervisors of Westchester, 4 Barb. 64 ; Powers v. Bergen, 2 Seld. 366 ; Wynehamer v. The People, 3 Kern. 392; The People ex rel. Baldwin v. Haws, 37 Barb. 440 ; Dartmouth College case, 4 Wheat. 519.)
The words, “ due process of law,” used in the United States constitution, and by the learned chancellor in the opinion above quoted, as well as in the state constitution, do not mean such proceedings in court as are contemplated by the statute in this case ; proceedings which are to be had for the purpose of determining, merely, whether the plaintiff’s property has *261 been destroyed or injured by a mob, and the extent of such injury; but they are applicable only to actions wherein the court is to detrmine, judicially, whether the party has, by his own acts, placed himself in such a condition that he may lawfully be deprived of his property by the judgment of such tribunal, or in satisfaction of such judgment. It was the object and design of the constitution, in this regard, to prohibit the legislature from passing such laws as should, by their own operation or authority, and without the act of the owner himself, divest him of his property. Ho person’s estate can thus be forfeited and taken from him without a violation of the constitution ; and a corporation like that of the city of Hew York, is a person, within the meaning of the constitutional prohibition, as well as its cestuis que trust, the citizens themselves, who it may be said, en passant, are, each, equitably interested in the property and estate which is legally vested in the corporation.
There is no pretense in this case, that the corporation of the city of Hew York, or any of its officers, agents, or servants, as such, aided or abetted the rioters, in the destruction of the property which is the subject matter of this action; or that any of them contributed in the slightest degree to the destruction of property set forth in the complaint; nor, indeed, is it probable, that any considerable proportion of the eight hundred thousand inhabitants of the city were, themselves, engaged in the riot. Of course, no recovery could have been had in an action of this character against the corporation, except for the act in question ; for no claim or right of action would have existed. It is by the statute, and its operation, therefore, that these defendants are to be deprived- of their property, if the plaintiff succeeds, and not by due process of law. The proceedings in court, contemplated by the act, are merely a part of the machinery to be used in perpetrating the wrong. The legislature have, themselves, assumed the powers and functions of the judiciary, and by the act, have -undertaken to adjudicate and judicially determine the rights of the parties, plaintiff and defendants in the actions to be brought; leaving to the courts *262 the duty, only, of ascertaining whether the property of such plaintiff has been destroyed of injured by a mob, and the amount of the damage sustained. That cannot legally be done. The legislature cannot thus do an act, indirectly, which the constitution prohibits them from doing directly. I can perceive no difference, in legal principle, between an act of this character, so far as the same is intended to affect the city of New York, and a statute which should, in like manner, authorize the forfeiture of one man’s property because of a crime perpetrated by another. Indeed, if the property of the corporation of New York may thus be taken in satisfaction of damages caused by mobs, I know no reason why the city may not, as such, be compelled by the legislature to bear all losses occasioned by fire, or robbery, within its limits ) or even to answer for the debts of its ■> merchants ; which, in view of the constitutional prohibition, would be monstrous.
The only question remaining for consideration is this ; Will the statute upon which this action is founded, if carried into effect through and by means of a judgment against the defend- . ants here, operate to deprive them of their property ?
When a statute is expressed in clear and unambiguous language, it needs no interpretation beyond what is to be found in its letter. The legislature should be intended to mean what they have plainly expressed ; and, consequently, there is no room left for construction. (Fisher v. Bright, 2 Cranch, 358. Case v. Wildridge, 4 Ind. R. 51. Jackson v. Lewis, 17 John. 475. Waterford & Whitehall Turn. Co. v. The People, 9 Barb. 161. Vattel, b. 2, ch. 7, § 263. McCluskey v. Cromwell, 11 N. Y. Rep. 593. Waller v. Harris, 20 Wend. 555.) But as all statutes are to be construed according to the intention of the legislature, (see Story on Const. § 392; Smith on Stats. § 478 ; Purdy v. The People, 4 Hill, 384 ; Waller v. Harris, supra, and authorities cited below,) in cases where the design of the law makers is not-clearly or fully expressed in the act itself, their intention is to be gathered from surrounding circumstances. It is, then, the duty of the court to make the inquiries, said by Lord Coke to have been held necessary, in *263 such cases, "by the barons of the exchequer, in their resolution in Heydon’s case, (3 Rep. 7,) viz: “ That for the sure and true interpretation of all statutes in general, be they penal or beneficial, restrictive or enlarging of the common law, four things are to be discussed and considered: 1. What- was the common law before the making of the act ? 2. What was the mischief and defect for which the common law did not provide ? 3. What remedy the parliament (legislature) hath resolved and appointed to cure the disease of the commonwealth ? 4. The true reason of the remedy ? And then, the office of the judges is always to make such construction as shall suppress the mischief, and advance "the remedy. In short, the reason and object of a statute, furnish a clue to its true meaning. (Dwar. on Stat. 696.)
The intention of the law makers, thus ascertained, is to be held and considered as a part and parcel of the act itself; for, in the language first used in Zouch v. Storrell, (Plowd. 366,) and substantially adopted in some of our own decisions, “ a thing which is within the intention of the makers of the statute, is within the statute, though not within the letter.” (See, also, Donaldson v. Wood, 22 Wend. 395 ; Dwar. on Stat. 562 ; Pillow v. Bushnell, 5 Barb. 156 ; People v. Utica Ins. Co. 15 John. 358; Dresser v. Brooks, 3 Barb. 429; Bac. Abr. Stat. J. 5, 10 ; Beaiofage’s case, 10 Co. R. 101.) I may add, we have no right to assume that the legislature designed to violate the constitution, but if .this statute, of itself, or when construed with the aid of surrounding circumstances, in accordance with these rules, leads, necessarily, to the conclusion that they intended to authorize certain acts to be done, and that the doing of such acts will deprive a person of the rights guaranteed to him by the constitution, it is our imperative duty so to adjudicate and determine.
What, then, was the reason which induced the passage of this act by the legislature, and what object did they intended to accomplish ?
Looking back through the legislation- of a thousand years, to the decennaries of Alfred, we find an unbroken series of *264 statutes, in England—that country from which we derive our common law, and the principles of most of our legislative enactments—providing that where a person has been robbed, or his property has been destroyed by a mob, he shall have his action therefor, against the hundred, parish, or city, within which the wrong was done, and recover the amount of his loss. The mischief designed to be prevented or diminished by those statutes is obvious ; and their reason and object are equally apparent. They were intended to make every member of the community responsible'for the conduct of each of the others, so as to excite all, through the strongest motive that influences man, self interest, to greater vigilance in foreseeing, and increased diligence in preventing, the crimes sought to be restrained. They were thus, as Lord Mansfield says in Radcliffe v. Eden, (supra,) made insurers, each for the others, and all for each.
The construction given, in this regard, by the English courts to statutes in pari materia with the act under consideration, may not only well be followed here as a safe precedent, but it is impossible, it seems to me, to imagine that the legislature, in this case, could have been actuated by any different or other reason. The grand object here, as in England, was to compel the whole community or corporate body to pay the loss. It was the intention of the legislature, I think, to substitute an entire community, in a case like this, in the place and stead of the doers of the wrong, and to hold them amenable in an action at law, and upon a judgment to be therein recovered against them, for such damages as have been sustained by the injured party, in like manner, and to the same extent, as such wrongdoers would, themselves, be, were they the parties defendant in an action for damages. In other words, the legislature must have intended that the party injured should have a right to bring his action against the corporation, and prosecute it to a final judgment, according to the course and practice of courts, and collect the same out of the property of the defendants; and, for that reason, such judgment must be *265 satisfied out of the property of the defendants, whether the same shall-be paid by the city treasurer, or not.
This conviction is strengthened, in my mind, by the following consideration : If the legislature did not design that the judgments to be obtained in cases of this character should be satisfied out of the property of the corporation, it was absurd to make it a party defendant; because such corporation would have no interest whatever in defending a suit, or incurring the expenses attending its defense. Nothing less than the promotion of rioting and incendiarism, perpetrated for the purpose of recovering damages in undefended actions, would result from this. Most certainly, the main object of the law would, in that case, be defeated.
I am, also, of opinion that the act authorizes the plaintiff in a judgment of this character, to issue his execution, if he shall so elect, and collect the same out of the property of the defendants.
The act, to be sure, directs the payment of a judgment recovered against the corporation, by the city treasurer, upon the presentation to him of a certified copy of the judgment roll by the plaintiff. But the latter is not bound to present the roll, either within a limited period, or at any time ; nor does the act, expressly, or by implication, prohibit the issuing of an execution upon the judgment. The right given to the plaintiff to claim payment from the city treasurer, even if the act, in this regard, can be construed as granting such right, instead of being merely directory to that officer, which may be a matter of some doubt, is therefore, a cumulative remedy, granted by this act, in addition to those rights, appertaining to and running with all judgments for money, which are conferred by other statutes upon all plaintiffs herein, without any exception.
There is a general rule, it is 'true, that when a right, not before existing, has been granted by statute, and a full remedy has also been given by the same act, the beneficiary has no common law remedy. But that rule, in strictness, applies only to common law remedies. A statutory remedy, conferred *266 by another statute, which covers all persons in like condition with such beneficiary, and which, of itself, is not inconsistent with the specific remedy granted, is a right given to the latter, and may be enforced by him precisely as if it was contained in the same special act; for all statutes in pari materia must be construed together, and read as one act. (Rogers v. Bradshaw, 20 John. 735. McCartee v. Orphan As. Society, 9 Cowen, 437. Rexford v. Knight, 15 Barb. 627.) In this case the remedy granted is, first, a judgment, and secondly, a means of collecting the amount of such judgment. The judgment itself' is as much a portion of the remedy specially granted by the act as is the method of obtaining payment. There is nothing’ in the special act, nor in the surrounding circumstances, tending to show that the legislature designed that the judgments to be obtained in actions of this description should not have all the attributes and powers conferred by another statute upon all judgments for money; and it follows that the moment a judgment is entered, in a case like this, the general provisions of the statutes in relation to all money judgments will be applicable thereto, for the two acts then being in pari materia, must be construed as one statute. It will then bear interest, will be appealable, will constitute a lien upon the real estate of the judgment debtor during the pendency of such appeal and until satisfied, and must be discharged of record in the mode provided by the general statute. Why, then, may not the plaintiff have the execution which is also given by general statute to all creditors in money judgments ?
The silence of the act in relation to an execution, furnishes no evidence of an intention, on the part of the legislature, to deprive the plaintiff in the judgment of the remedy by execution which is given to all judgment creditors of the same class, by other statutes in force when this act was passed. It is equally silent as to executions upon the judgments against the mayor and sheriff, which are authorized, in certain cases, by the same act; but it will hardly be contended by any one, that, because, of such omission, executions may not be issued *267 against the property of those officers. (See Dudley v. Mayhew, 3 N. Y. Rep. 9. Almy v. Harris, 5 John. 175.)
The final judgment contemplated by the statute under consideration, is, therefore, it appears to me, to be, like all other judgments of the court, not only appealable, but “ the final determination of the rights of the parties in the action; ” (Code, § 245 ;) that is, it will constitute a full, perfect, and final adjudication and determination by the court, that the plaintiff is entitled to, and shall recover and have from the defendants, the sum awarded ; and, the moment it is docketed, the following provision of our general statutes will be applicable, and will attach thereto, viz : “ All judgments hereafter rendered in any court of record, shall bind and be a charge upon the lands, tenements, real estate, and chattels real, of every person against whom any such judgment shall be rendered; * * and such real estate and chattels real shall be subject to be sold upon execution to be issued upon such judgment.” (2 R. S. 358, § 4.)
At his own option, therefore, the plaintiff may issue his execution and sell the property of the defendants. In other words, the effect of the act is to clothe the plaintiff with the power to divest the defendants of their property, if, and whenever he shall see fit. Can it be that a statute which thus, in and by its operation, places a lien and charge upon the property of a person, and empowers another, at his will, to divest the owner of his estate therein, is less a violation of the constitution than an act which simply directs the property of one man to be. sold, and the proceeds paid over to another P Is there any doubt that if the act in question had merely authorized the recovery of a judgment against the city, without directing the city treasurer to pay it, such act would have been void, because contrary to the constitution ? Or, would the right of the plaintiff to issue, or to refrain from issuing, an execution, at his option, render it valid ? In the case supposed, the plaintiff would be empowered to deprive the defendants of their property, through, and by means of thé judgment, and to vest it, or its proceeds, in himself, at his pleasure; and *268 that is exactly what he is authorized to do by this act, notwithstanding the direction'to the city treasurer, inasmuch as he may or may not present a copy of the judgment roll to the latter.
It may happen, too, that when the judgment roll is presented to the city treasurer, he will be unable to pay, for want of funds. In that case, the judgment creditor may issue his execution and sell the property of the corporation upon the judgment, if a recovery is had ; for so the statute provides as to all judgments for any debts, damages, or sums of money, without exception. (2 R. S. 359, § 4. Id. 353, § 1.)
But, again, the law cannot be. obeyed by the city treasurer without divesting the defendants of their property.
The act, it will be remembered, directs the treasurer to pay the judgment, and charge the amount to the city or county. He is not required to pay it out of his own funds, and to look to the city or county for reimbursement; if he was, the act would be unconstitutional for that reason. But, I think, the legislature designed that the treasurer should pay such judgment out of the moneys in his hands belonging to the judgment debtor, whether a city or county. What construction can be more ’ plain, simple, just and equitable than this ? The whole object and intent of the law, ultimately, is to substitute the city or the • county, as the case may be, in the place of the wrongdoers, and to compel such city or county to pay the damages.
Conceding, however, for argument’s sake, that the judgment is to be satisfied out of any moneys in the hands of the city treasurer, which he is authorized to charge to the city upon payment; how will the matter stand ?
There are two species of funds in the hands of the city treasurer, standing to the credit of the city ; one of them being derived from taxes, and the other arising from loans to the corporation, licenses, and the sales and rents of their houses, wharves, ferries, markets, &c. The last mentioned class of moneys are as much the property of the corporation, in absolute ownership, as is the ground upon which its city hall stands. The moneys *269 derived from taxes are collected and paid into the hands of the city treasurer, under and by virtue of an annual act, specially passed for that purpose by each successive legislature, which "empowers and directs the supervisors of the county to raise by tax certain sums of money, amounting, in the aggregate, to some two or three millions of dollars, for the use of the mayor, aldermen and commonalty.
These moneys, thus raised by taxes, do ’not belong to the corporation ; because no grant to them is expressed in the act, and no grant from the sovereign can be implied. They are, merely, trustees or custodians of the funds, for the purposes declared in the aet.
But such funds cannot, legally, be applied by the city treasurer to the payment of the judgments contemplated by the statute upon which this action is founded, inasmuch as those tax laws, passed, too, subsequent to the enactment of the statute in question, expressly direct and provide that the moneys so raised by taxation shall be expended upon and for the particular objects specially enumerated in the laws themselves ; among which, the payment of judgments of this character is not to be found. (See Sess. Acts, 1862, 1863.) For we must bear in mind, the question before us is, not whether the act is, per se, a violation of the constitution, like a statute which, of itself, divests a person of his property without the aid of other machinery, or any intermediate agency; but whether, if carried into effect by means of a judgment here, such act would, at the time the decision below was made, have effected a violation of the paramount law of the land, in view of the facts which existed at the time the right of action is claimed to have accrued, and when the judgment at special term was rendered.
But, beyond this : In 1857, two years after the passage of the-statute under consideration, an act was passed by the legislature, purporting, in its title, to be “ An act to amend the charter of the city of New York,” (Valentine’s L. City of N. Y. p. 276,) which provides that “ annual and occasional appropriations shall be made by proper ordinances of the common *270 council, for every branch and object of city expenditure ; and no money shall be drawn from the city treasurer, except [unless] the same shall have been previously appropriated to the purpose for which it is drawn,” (§ 31;) which act still stands unrepealed. It is impossible to suppose that the legislature designed to compel the corporation to consent, by making the appropriation mentioned in this statute of 1857, to be deprived of their property, contrary to their will, and in violation of the constitutional provision ; but if the first portion of the section cited is to be so construed, it is, for that reason, void and inoperative as to such cases. The prohibition contained in the latter clause, however, is valid; and not only has no appropriation been made by the common council for the payment of judgments in actions of this description, but, as we have seen, they are, substantially, forbidden by the subsequent statutes of 1862 and 1863 to make any appropriation of the moneys derived from taxes, to that object. In effect, therefore, that provision of the act under consideration which directs judgments to be paid by the city treasurer, is repealed by the statute of 1857 ; for, leges posteriores, priores contraries ábrogant.
hi or'is the plaintiff aided, in this regard, by the provision contained in the annual tax law of 1863, which authorizes the mayor, aldermen and commonalty to borrow money upon their bonds, to pay such judgments as may be recovered against them after the annual tax for that year shall have been levied, (as would have been the case here had judgment gone for the plaintiff at special term,) and which also empowers the supervisors to levy taxes in 1864, for the payment of such bonds. For that is a mere power conferred upon the corporation, and may or may not be exercised, at their pleasure ; and unless exercised, no moneys are to be raised by the supervisors for the payment of the contemplated bonds, as there will be none. If, instead of a permission to the corporation to borrow money, the act imperatively commanded them to do it, such act would certainly be void.
It appears to me to be quite clear, therefore, that the city treasurer cannot pay the judgments contemplated by the act *271 of 1855, out of any moneys in his hands, other than those which belong to the defendants in absolute ownership; and, as he is imperatively commanded and required by the act to pay such judgments, and charge the same in his accounts against the city, it follows that he must pay the same out of the funds so belonging to the corporation.
But further : Even assuming that the power given to the plaintiff to obtain payment from the city treasurer supersedes the right given to all creditors in judgments, by other statutes, to issue an exception for the collection of the same, still, it seems to me, a judgment obtained in an action of this description will carry interest, (Laws of 1844, ch. 324, §4,) and will be a lien and charge upon the real estate of the debtor, from the docketing of the same until it shall be paid. For, certainly, the judgment itself is as much a portion of the remedy given to the plaintiff, as is the right to bring an action, or to collect such judgment from the city treasurer, in the manner prescribed by the act. Had the statute merely authorized the recovery of a judgment, without going further, the plaintiff would have been entitled not only to an appeal, but to collect the same by execution. (Dudley v. Mayhew and Almy v. Harris, supra. Miller v. Taylor, 4 Burr. R. 2303. Beckford, v. Hood, 7 T. R. 627. Ewen v. Jones, 2 Salk. 415. 2 Inst. 53, 74, 118. Bac. Abr. St. 16. Clark v. Brown, 18 Wend. 213.)
The judgment, in that case, clearly, would have been clothed with all the attributes of money judgments in other cases, and the plaintiff therein would have been entitled to all the rights given by statute to creditors in like judgments. The substitution of the one mode of collection for the other, deprives him of no right which the law gives him as judgment creditor, except that of issuing an execution, even if that is an exception. The lien remains.
Can it be doubted that an act which thus authorizes the creation of a judgment debt against the defendants, without their assent and contrary to their will, and charges their lands for its payment, operates to deprive them of their property, pro tanto, *272 just as much as would the sale-of a portion of such lands on execution ? If that is not so, the legislature may, at their pleasure, legally, compel a man, against his will, to mortgage his property to another, although they cannot force him to convey it, without violating the constitution ; and the absurdity of that proposition is too gross to require discussion. The effect of this lien or charge will be to deprive the corporation of the right to use, sell or lease the same, free of incumbrance ; and that right is, of itself, property. (Wynehamer v. The People, 3 Kern. 378.) Such charge upon the defendants’ lands, therefore, will not only deprive them of their property without due process of law, but will also impair the obligation of the contract embodied in their charter, which declares that such corporation “shall and may forever hold, enjoy and use the property granted, with the profits thereof, without hindrance or impediment ” of the sovereign grantor, or his successor as such. It should be considered, too, in examining this branch of the subject, that the plaintiff, if he shall so elect, may refrain for years from presenting his judgment roll, or collecting his judgment, and, in the .meantime, may permit the interest to accumulate. Indeed,- a safer or more profitable investment than this could, probably, hardly be found.
If I have not erred in the foregoing conclusions, it follows, in brief:
First. That a judgment in this action in favor of the plaintiff, will entitle him to demand the payment of the same from the city treasurer, out of the funds in his hands belonging to the corporation as owners ; and that he may compel sqch payment by mandamus. The duty of the treasurer to pay is imperative, and the judgment will be a bar to all constitutional objections.
Second. That the plaintiff in such judgment nray, at his option, issue his execution thereon, and sell the property of the corporation.
Third. That such judgment will be a lien and charge upon all the real estate belonging to the corporation, amounting to many millions of dollars.
*273 Fourth. In either of those cases, the defendants will he deprived of their property by and through a judgment in favor of the plaintiff, contrary to the express prohibitions contained in those supreme and paramount laws of the land, which judges are sworn to support and enforce.
We have nothing to do with the question, suggested at the hearing, as to whether recoveries under the act will tend to prevent or diminish the evil sought to be remedied by it; or, on th(; contrary, whether, considering the facility with which mobs may be raised and property destroyed, and heavy damages recovered therefor, through the testimony of the plaintiff himself, the danger of incendiarism may be greatly increased. The reasons for or against the policy of the statute are exclusively within the province of the legislature. We are, simply, to examine carefully, and determine without fear or favor, whether the act in question can be carried into effect by means of a judgment against the defendants in this case, without violating the constitutional provisions above referred to. My mind, for the reasons I have mentioned, is irresistibly forced to the conviction that it cannot.
I am, therefore, of opinion that the judgment at special term was right, and ought not to be disturbed.
Judgment reversed, (a)

 The case of Darlington v. The Mayor, &c. of New York, in the Court of Appeals, (31 N. Y. Rep. 164,) involves the same questions examined and decided in the above.