WILLIAM M. BALDWIN et. al., Appellants, v. THE MAYOR, ETC., OF NEW YORK, Respondents.

This case is decided upon a point not considered by either of the judges in their opinions given below.

Those opinions are valuable as presenting in very able and exhaustive arguments, the opposing views of two of the judges of our highest court, upon the constitutionality of an act of the legislature, providing for the arbitration of a claim against the city of New York, and the payment of such amount as the arbitrators should award.

As the conclusions of neither upon the points discussed, seem to have been affirmed by the court, there are no questions of law *finally determined* which can be embodied and presented in head-notes. The opinions, however, will amply repay perusal and study.

The decision reached by the court *seems* to be that, an order by the Special Term, vacating a judgment upon the ground of fraud and collusion, is within its discretion, and will not be reviewed by this court.

A MOTION was made at a Special Term of the Supreme Court, in the first district, to set aside the judgment of the plaintiffs herein, on the ground that it was obtained by collusion and was founded in fraud.

On the 30th of November, 1864, that motion was granted; on appeal, the order was affirmed at General Term in February, 1866, and the plaintiffs have appealed therefrom to this court. The judgment was recovered on the 13th of June, 1863, for $74,299.40, and was founded on the award made as hereinafter stated.

The Croton aqueduct board, in the fall of 1858, advertised for bids for constructing certain gates, etc., for a receiving reservoir, and the contract was to be awarded by the Croton board, subject to the confirmation of the common council of the city.

The plaintiffs were the lowest bidders, and the board awarded the contract to them, subject to the action of the common council. The common council, on its being shown to them, as they held, that the same job was included in a contract already entered into with others, refused their assent to the proposal of the plaintiffs, and they never had any con-

tract with the defendants for any work whatever. The plaintiffs instituted various actions and proceedings in the courts against the defendants for relief; among others, to compel the defendants to award the contract to them. This was unsuccessful. They also obtained an injunction, prohibiting others from doing the work; that was dissolved. By their procurement then, the people of the State, through their Attorney-General, obtained an injunction against them, prohibiting defendants from awarding a contract for doing this work to said other parties, etc. In the winter of 1860, the Croton board applied to the legislature for an act in reference to the aqueduct and reservoir, and the plaintiffs appeared and opposed the passage of any such act. But at their instance, the legislature inserted a provision for the plaintiffs' relief. The first section of that act authorized the Croton aqueduct board to acquire title to certain lands in New York city; the second and third sections regulated the mode of such acquisition; the fourth authorized said board to construct, on said lands, a gate house and a branch aqueduct, etc.; in the body of this section follows this provision: "And for the purpose of adjusting and determining the damages that the contractors, to whom the gate house and aqueducts specified in this section were awarded by the Croton aqueduct board on the 27th of October, 1858, which they may be equitably entitled to recover of the city of New York, the same may be ascertained by three arbitrators, one of whom may be chosen by the mayor of the city of New York, and due by the parties claiming such damages; and the third shall be appointed by the two arbitrators chosen as aforesaid; such arbitrators shall take oath, and shall proceed to hear the case, and make and deliver their award therein as provided in title fourteen, chapter eight, part third, of the Revised Statutes, third edition, and upon filing such report with the clerk of the county of New York, an order of confirmation may be entered of course, and thereupon, if such report be in favor of the party claiming damages, such party shall be entitled to recover the same, and, upon presenting a certified copy of such report and order of confirmation

to the comptroller of the city of New York, it shall be the duty of the comptroller to draw his warrant for the amount thereof, and to pay the same." (Laws of 1860, p. 774.)

The title to this act is as follows: "An act to facilitate the acquisition of land for a junction gate house and to connect the same with the new reservoir and the city mains in the city of New York, and to provide for the settlement of claims for damages connected therewith." (Laws of 1860, p. 772.)

This act was passed on the 16th day of April, 1860. On the same day (16th of April), the then mayor of New York was in Washington city, and remained there throughout the remainder of that month; this fact, stated in the moving papers, is not directly disputed or denied by the other side. Upon the absence of the mayor from the State, the duties of that office, by law, devolve upon the president of the board of aldermen.

On the 26th of April, 1860, the then acting mayor of New York, in the absence of the elected mayor, from the State, appointed Jacob F. Oakley, an arbitrator for the city, pursuant to said act, and said Oakley accepted the appointment and qualified as such by taking the requisite oath on the same day.

The elected mayor, either while in Washington or after his return, appointed another person arbitrator; the plaintiffs appointed one, and they two, appointed a third; a hearing was had, commencing in June, 1860, the defendants declining to appear on the ground of the unconstitutionality of the act authorizing the arbitration; and, after the examination of various witnesses, the arbitrators, on the 16th day of November, 1860, awarded damages to the plaintiffs in the sum of $61,821.

After various unsuccessful efforts to collect the award by legal proceedings and otherwise, an action was commenced thereon in February, 1862, and the defendants appeared and put in an answer, setting up, among other things, that the appointment of the arbitrator assumed to have been appointed by Mayor Wood was null and void, as, on the day of its date, 17th April, 1860, and from the 16th of April, 1860,

and throughout the remainder of that month, Mr. Wood was absent from the State of New York, and that Mr. Oakley had been properly appointed, but that the defendants never authorized or sanctioned the appointment of either. The answer also in substance alleged that the plaintiffs never had had a contract with the defendants; that, in the notice for proposals by the Croton board, it was stated that any award of contract was subject to the condition (as the fact was) that the same should not be obligatory unless the same should be confirmed by the common council, and that the contract to the plaintiffs was never confirmed, but was rejected; and that the act of the legislature assuming to authorize said arbitration was not obligatory.

In February, 1863, the case was referred for hearing to a sole referee. Greene C. Bronson was counsel to the corporation until 1863, and put in the answer in this cause.

Various hearings were had before the referee; but it is stated in the moving papers, and not denied, that no witness was examined on the part of the defense, but the opposing papers state that the case before the referee was vigorously and strenuously contested. What one question of law or fact was contested is nowhere stated. On the contrary, it affirmatively appears, by the numerous letters of the counsel to the corporation, sent to the comptroller by him, urging the payment of the judgment, that in his opinion nothing could be inquired into on that trial except "one question, and that one of fact, viz.: whether or not an award had been made." In the same communication he had previously stated as follows: "Before I entered upon the duties of this office, three arbitrators, appointed by authority of the legislature, had heard the testimony, and arguments of counsel, and given an award upon the claim of Baldwin & Jaycox against the city." He gives, as a reason why no one was called as a witness in the action on the award, the fact stated above, that the only question to be tried was, whether an award had in fact been made.

That an award had in fact been made, had never been disputed or denied. But the Supreme Court in the first

district, at General Term, had before that time given a deliberate opinion that the act of the legislature, so far as respects the authorizing of this arbitration, was unconstitutional and void.

The corporation counsel, although repeatedly requested to take measures to appeal from the judgment entered herein, omitted to do so, and repeatedly advised the comptroller against an appeal. Finally he omitted to answer the letters of the comptroller on the subject, and refused his assent to the employment of other counsel. The common council by resolution authorized the comptroller to employ counsel to appeal from the judgment or to get it opened, etc. The comptroller, under that authority and by his own, employed other counsel, and the motion was made and decided, and the appeal taken as before stated.

*L. R. Marsh*, with whom was *W. F. Allen*, for the plaintiffs, appellants.

*Wm. Fullerton*, for the respondents.

PECKHAM, J. Preliminarily it is objected, that this motion cannot be made by any one, except by the counsel to the corporation; that another attorney cannot appear without a substitution; further, that no one but the counsel to the corporation could make the motion, as the statute of 1863 gave that exclusive right to him, and made it his peculiar duty; that the act of 1859, which allowed the comptroller to intervene and move to set aside a judgment that he had reason to believe was obtained by collusion or was founded in fraud, was unconstitutional; if not, that it was repealed by the act of 1863. (Laws of 1863, p. 409.)

I have carefully considered all these objections, and some others, and think they cannot prevail. As to the merits, is there evidence here that this judgment was "obtained by collusion or founded in fraud?"

In my judgment, sufficient ground is found in the facts to warrant the court, at Special Term, to set aside this judg-

ment and allow the defendants an opportunity to defend this action.

It is proper, in a motion of this kind, irrespective of the statute, to look somewhat at the judgment, and, though it may not be "founded in fraud," to see if it be just. The court may look at the whole case and all its attendant circumstances. Of course, if there has been a *bona fide* trial on the merits, this act never intended to give defendants another. That would be a plain wrong under a pretense of justice; but the ground of the action may be considered in reference to the fact of collusion.

It appears that the plaintiffs never had a contract with the defendants as to the aqueduct. They never had, as it had been distinctly adjudged by the courts, any legal or equitable claim against the defendants; after this had been decided, they procure the passage of the act under which this award was made. By their contract, they proposed to do all the work and find all the materials for less than $137,000. Their award for damages is $61,821, and the chief engineer states that the work and materials actually cost over $200,000. Yet, the plaintiffs, so far as the facts show, recovered this award simply for profits they would have realized upon a contract never made. Thus the case stands on its merits: First, they never had a contract with the defendants; second, they proposed to find materials and do work for less than $137,000, which actually cost, according to this affidavit, over $200,000, and yet they are awarded $61,821 for profits.

As to the constitutionality of this law. The Constitution declares that "no private or local bill, which may be passed by the legislature, shall embrace more than one subject, and that shall be expressed in the title." (Art. 3, § 16.)

The title of this act is as follows: "An act to facilitate the acquisition of land for a junction gate house, and to connect the same with the new reservoir and the city mains in the city of New York, and to provide for the settlement of claims for damages connected therewith."

Was this bill, irrespective of "the claims for damages," a local bill? It provided for the acquisition of a small piece of land, of less than a hundred feet square, in the city of New York, by the Croton board for said city, and for an improvement thereon by erecting a gate house, etc. It was simply a local improvement thus authorized. It did not contain any general provisions of any character, as to the acquisition of other lands by the city, or for any other general purpose, but it authorized a local improvement upon a comparatively small piece of land. What element did it lack of a local bill? If a local bill, as I think it was, then it could embrace "but one subject," and that should be "expressed in the title." What had the settlement of the claims for damages of these plaintiffs to do with the subject of that local bill? Their claim was no incumbrance on the land to be acquired, that it became necessary or proper to extinguish it; it had as little to do with the improvement authorized to be made thereon.

The plaintiffs' claim in no manner affected the "subject" of that local bill; neither added to or detracted from it. Therefore it was no part of the "subject" of that bill; but it was another and a different subject. So far as it respects the plaintiffs, it was a private bill for damages for not being allowed to construct that gate under a prior act of the legislature without any reference to this statute. This local bill, therefore, embraced more than one subject, and it was contrary to the provision of the Constitution before cited.

Again, it is entirely clear that this act, so far as respects the provision for the relief of the plaintiffs, was a private bill. It could, therefore, "embrace but one subject, and that shall be expressed in the title." (Const., art. 3, § 16.) But, here were two subjects, whether the other was a local bill or not; and a private bill, as this must be conceded to be, can "embrace but one."

The evils apprehended and guarded against by this constitutional provision, are found here. These bills did not stand on their separate merits. The plaintiffs state, in substance, that the bill could not have passed without the provis-

ion for their benefit. They had opposed it successfully till that was inserted.

Again, the "subject" of this private bill was not expressed in the title. The title, so far as it can be claimed to refer to this subject, is " and to provide for the settlement of claims for damages connected therewith."

The plaintiffs had no claim for damages for any thing authorized to be done under this act. Their claim was in no manner "connected therewith." Theirs was an old claim for damages for not having a contract under a prior law, to build this gate.

In fact this reference in the title to the subject of the act, was entirely proper as applicable to those to whom compensation was authorized under this act, for interfering with their rights of property. From such a title I think no one would have suspected such a claim as this. I perceive no purpose of this constitutional provision except to prevent fraudulent legislation, the smuggling through of acts containing provisions unknown to the body of the legislature. This constitutional provision would be a great obstruction to such purposes, and deserves to be upheld.

Whether this mandate of the Constitution has been complied with by a sufficient description of the subject in the title of an act, it seems to me is plainly proper for the courts to determine, not for the discretion of the legislature or for the adroitness of those who may deceive the legislature. It seems to me absurd to say that a compliance with this mandate is a matter of discretion for the legislature. That is equal to saying that the provision of the Constitution shall be obligatory, provided the legislature shall choose to obey it. If the absence of any title would have rendered this act void, certainly a false or delusive title would not make it valid. But had the legislature power to pass this act? This is an interesting and most important question, and I am free to admit that the tendency of the modern decisions in our courts favors its validity. But my impressions are strongly against it. The great object of all government in civilized countries, is the security of the person and property

of its citizens, and of the rights pertaining to each. It has been well remarked by an able judge, that it has never been allowed to be a rightful attribute of sovereignty in any government professing to be founded on fixed laws, however despotic the form of the government might be, to take the property of one individual and bestow it upon another. The possession and exertion of such a power would be incompatible with the motive and object of all government. This power, therefore, instead of being acknowledged, was expressly repudiated by the Roman law at the height of imperial despotism. (*Bloodgood* v. *M. & H. R. R. Co.*, 18 Wend., 56), per Senator TRACY. To the same effect, see *Taylor* v. *Porter* (4 Hill, 144), and cases there cited.

The possession of any such power could never be presumed by a mere grant of "the legislative power of this State." In *Wilkinson* v. *Leland* (2 Peters, 657), Mr. Justice STORY said such a power "has been constantly resisted as inconsistent with just principles, by every judicial tribunal in which it has been attempted to be enforced." The exercise of such a power is against what Chief Justice NELSON, in *Taylor* v. *Porter*, calls "natural right," but I do not propose to base my opinion on that ground.

In this case it had been judicially determined prior to the passage of this act, that the plaintiffs had no claim against the defendants for damages, legally or equitably. They had no contract, they had done nothing, and they had furnished nothing for the defendants.

Is this not then the taking of the property of the defendants and bestowing it upon the plaintiffs, for the legislature to declare, under these circumstances, that the defendants shall pay to the plaintiffs any given sum, or any sum a board of arbitrators shall award?

But it is urged that the defendants own no property, that all their property belongs to the State or to the public, and hence the legislature may dispose of it as they will. Suppose it be conceded that all the property of the defendants belongs to the public, or is public property, still the legislature is the mere trustee or agent of the people to dispose of

and manage it for public purposes—for the public welfare. Is not such a disposition of defendants' property a total violation of the trust reposed in the legislature?

As between citizens, would any court hesitate to enjoin a trustee from thus prostituting his trust; from thus diverting the property and ruining the interests of his principal?

If it be the property of the public, the legislature, as the trustee of the people, can lawfully appropriate it only to public, not to private, purposes. The legislature can properly act only upon that view. It should always be for a public purpose, a public benefit. It is undoubtedly for the public benefit, that just demands of individuals against the State should be satisfied; appropriating the property of the State therefor would, of course, be applying it to a public purpose.

Eminent judges, who have most strongly upheld the powers of the legislature, admit that there are some things that the legislature cannot do, although not prohibited by the Constitution.

In *The People* v. *The Mayor of Brooklyn* (4 Comst., 424), Mr. Justice RUGGLES says: "It may be proper here, although not strictly necessary, to express the opinion that money cannot be exacted by the government by right of eminent domain, excepting, perhaps, for the direct use of the State at large, and when the State at large is to make the compensation.

The exigencies of a State government can seldom require the taking of money by virtue of this power, even in time of war, and never in time of peace." He places this lack of authority on the ground that the framers of the Constitution could not have intended to delegate such a power, "because it is entirely unnecessary."

So in *Town of Guilford* v. *The Supervisors of Chenango County* (3 Kern., 147), Mr. Justice DENIO says: "And there is moreover a principle arising out of the distribution of political power among the great departments of the government, which prevents the legislature from attempting the exercise of judicial authority."

It is said the defendants have no private as distinguished from public property. (But see *Bailey* v. *The Mayor of New*

*York,* 3 Hill, 531, and cases there cited; *Britton* v. *The Mayor, etc.* 21 Howard's Pr., 251; 2 Kent's Com. [5th ed.], 305, and the cases cited in *Darlington* v. *The Mayor of New York,* 31 N. Y., 164.)

If the property of any given locality may be appropriated by the State to any private purpose, it is not of the slightest practical importance whether it be called public or private property.

In *The People* v. *The Mayor, etc., of Brooklyn* (4 Comst., 427), it is said that "the power of taxing and the power of apportioning taxation, are identical and inseparable," and that power is vested "exclusively" in the legislature.

If A owns three thousand acres of land, employs three hundred workmen thereon, and one of them claims that A owes him $1,000, which A utterly denies, the legislature by this doctrine may levy a tax for that $1,000 upon the district composed exclusively of those lands, and pay the amount over to the complaining workman.

This is plainly taking the private property of one man and giving it to another. I think no judicial tribunal would hesitate to pronounce such a law unconstitutional. The act would be a plain violation of the Constitution, which declares that no person shall "be deprived of life, liberty or property without due process of law." The right to tax is not thus denied, but to tax for such a purpose. It has been properly said that, "it is unfit for the judicial department to inquire what degree of taxation is the legitimate use and what may amount to the abuse of the power." No such right is claimed, but the purpose for which the property of a locality—of a municipal corporation—is required to be taken, may become a legitimate subject of judicial inquiry.

Chancellor KENT says: "It undoubtedly must rest, as a general rule, in the wisdom of the legislature, to determine when public uses require the assumption of private property; but if they should take it for a purpose not of a public nature—as, if they should take the property of A and give it to B or, if they should vacate a grant of property, etc., under the pretext of some public use or service—such cases

would be gross abuses of their discretion, and fraudulent attacks on private rights, and the law would clearly be unconstitutional and void." (2 Kent [5th ed.], 340.) See discussion of the subject of legislative and judicial power, with full references, in Sedgwick on Const. Law, 160, etc.

It is, perhaps, impracticable to inquire as to the purpose of the appropriation of property belonging to the State at large. In imposing a tax on the State, "government acts upon its constituents," which is some guaranty against erroneous or oppressive taxation. Not so as to localities; their property may be given away despite the opposition of their local representatives. In my opinion the provisions of the Constitution for the protection of the rights and property of persons apply, and were intended to apply, generally and measureably to all municipal corporations. In the case at bar, I think the legislature had no right to appoint a board of arbitration to determine how much damages the plaintiffs were equitably entitled to. In a late case in this court, I am aware that this right is defended by a very distinguished judge. (*Darlington* v. *The Mayor of New York*, 31 N. Y., 164.) It is there placed on the same principle under which a board has been frequently created to adjust claims against the State. But, with great deference, the principle is entirely different in the two cases. The State cannot be sued. Hence the legislature may itself determine, or may appoint a board to adjust the claim.

All municipal corporations, counties, towns, cities and villages may, and always could, in this State, sue and be sued in courts of law and equity. There is no reason why the legislature should act as a court, assuming judicial functions as to all claims against such municipalities; nor have they any more right to create a new tribunal proceeding contrary to the course of the common law, and thus deprive such a municipality of the right of trial by jury.

There is no reason why this right of trial by jury, secured to every citizen, should not belong to such corporations; no reason why the imposition of this corporate machinery should deprive the individuals of their personal rights. Public

policy and common justice would grant such right, and it seems to me it cannot be supposed that the framers of the Constitution intended to exclude such corporations from its benefits.

Judicial power is not granted to the legislature in the great divisions of power in the government. (See *Wynehamer* v. *The People*, 3 Kern., 391.)   The legislature has never been regarded as the proper tribunal for judicial investigation.

The determination of the question whether any thing, and, if any thing, how much, is due from the defendants to the plaintiffs, is a judicial question, and properly belongs to the judicial department of the government.   That it is entirely a judicial question I think cannot well be disputed. Its exercise by the legislature as to claims against the State at large is justified from the necessity of the case.   The government has provided no other remedy for the adjustment of claims against the State at large.

But the Constitution has provided other tribunals for the adjustment and determination of all claims against municipal corporations.   Legislative "judgments," as between citizens and local corporations, are, I think, in our State, of modern growth, equally unauthorized and impolitic.

There is a plain distinction between this case and the cases of the *Town of Guilford* v. *The Supervisors of Chenango County* (3 Kern., 143), and *Brewster* v. *The City of Syracuse* (19 N. Y., 116).   The first of these cases relies upon *The People* v. *The Mayor of Brooklyn* (4 Comst., 149), which I think is no authority for the doctrine; and the second follows without any general discussion.   But I am not disposed to deny that those decisions are at war with the views here presented.   Those cases, as reported, presented strong equities. In one, money had, in good faith, been expended in conducting a suit by order of a town-meeting; in the other, services rendered and materials found.   The legislature ordered a tax upon the localities in each case for their payment.   It is claimed that the legislature have the right to levy a tax to satisfy a demand against a locality.   The demand being con-

ceded, the right is also conceded. But if the legislature, as in the case at bar, admit the demand to be unliquidated, disputed and denied, in my judgment its adjudication belongs exclusively to the courts established under the Constitution. When the legislature, then, assume to appoint an arbitration for its settlement, and order their award to be paid, they violate that provision of the Constitution which declares that "no person shall be deprived of life, liberty, or property, without due process of law;" deprived thereof, "not by an act of the legislature, but in the due administration of the law itself, before the judicial tribunals of the State." (3 Kern., 393.) It also violates that provision which secures "the trial by jury in all cases in which it has been heretofore used." Assuming that these provisions apply to municipal corporations as well as to citizens and to other corporations, as I think they do, this act is a plain violation of both.

By the act of establishing this board of arbitration, the legislature concede that the claim is not admitted—that it is unsettled and denied. In such cases the courts should determine it.

When the legislature orders a tax to be levied for the payment of any alleged claim against a locality, it is, I admit, more delicate and practically more difficult to declare it void.

If it appear, however, or be conceded, that the tax is for a claim for services or for damages disputed and denied by the corporation, then in my judgment the act would be void, for reasons before given.

If the law be otherwise, then the legislature is without limit in its power to dispose of the property of these localities for any and every purpose, to gratify a friend or a favorite, without any responsibility to their constituents, as it would generally be accomplished notwithstanding the opposition of the local representative.

Whether the legislature give what is termed by the counsel a "legislative judgment," on an *ex parte* hearing, or what is regarded as next in value, appoint a board to award what they deem equitably due to the claimant and order its

payment, the principle at the foundation of each is the same. It need not be confined to contracts or *quasi* contracts. It applies quite as well to torts. After a long and unsuccessful litigation in the courts, a person claiming to have been injured by a defect in a sidewalk, or because the mayor spoke disrespectfully of him, may come to the legislature and get a judgment, denied to him in the legally appointed judicial tribunals of the land. All suits of every character against a municipal corporation, may be appealed from the courts and heard *ex parte* before the legislature; nor will this doctrine confine the legislature to the relief of cases sufficiently plausible to have been the subject of an unsuccessful suit. If A be a good Baptist or a good Romanist, or if he be a handsome man, therefore the legislature, in their unlimited power, may order the defendants to pay him $10,000 a year during his natural life. Such a law, I think, would scarcely be held valid. The Constitution has established judicial tribunals for the exclusive determination of claims against municipal corporations as well as against citizens, and intended and authorized no appeal therefrom to the legislature.

Claimants against municipal corporations have in this respect, the same rights and remedies they have against citizens, and they ought to have no more.

There seems to me no sound reason why the citizens constituting this municipality should not in cases like this have the same right of trial by jury in their corporate that they have in their individual capacity. For the legislature to adjudge these claims against localities, or to appoint extraordinary tribunals to determine them, is, in my opinion, at war with the policy and principles upon which our government was organized.

These views are not in conflict with the power of the legislature to order the sale of certain public property of a municipal corporation, and to appropriate the proceeds to other public purposes of the corporation; nor do they conflict with the decision in case of *The People* v. *The Mayor of Brooklyn*, in 4 Comst., 427.

The exercise of the right of eminent domain is a peculiar proceeding and specially provided for in the Constitution. When the property of a private citizen is taken for public purposes, his compensation therefor should be paid by the public. The court held that the legislature had the power to determine what portion of the public should bear this conceded public burden.

In *The Town of Guilford* v. *Cornell*, when before the Supreme Court, as reported in 18 Barb., 644, Mr. Justice GRAY, in delivering the opinion, remarked: "I have never heard it doubted that whenever a moral obligation exists on the part of the government to relieve one of its citizens, sufficient to support a promise if the same state of things existed between individuals, the legislature has the right to recognize the obligation and discharge it by the imposition of a tax. The legislature, being the only department of the government that can provide the relief, * * must of necessity be the exclusive judges when the interest or the honor of the government justify a tax," etc. In my opinion, the legislature has nothing to do with providing for claims against municipal corporations, unless their validity is established or conceded. Neither the "interest" nor the "honor" of the government is involved in the question whether a local corporation owes a debt or not.

Citizens having claims, legal or equitable, against a municipal corporation, have abundant remedies in the courts established by the Constitution—remedies for all legal or equitable rights, and they ought to have a remedy for no other. Occasional cases of hardship, no doubt, are found there as elsewhere, when what may be thought by some to be a moral equity is declared not to be a legal obligatory equity. Such exceptional cases form no ground for a change of the law or of the powers of any department of the government. It does not seem to be advisable to extend the doctrine of the Syracuse or of the Chenango county cases. They do not sustain this law, though they are, perhaps, inconsistent with some of the views here expressed. This was not a permissive, but a compulsory, arbitration. The

mayor, not the defendants, was authorized to appoint an arbitrator. If it were voluntary or permissive, it is difficult to see why the plaintiffs went to the legislature when both parties, if *willing*, had already abundant authority to arbitrate. If permissive merely, the defendants never ratified or entered upon it. The mayor is not the defendants. Raising the money to pay the judgment does not estop the defendants from contesting its validity.

The order appealed from does not finally dispose of the cause, it merely affords an opportunity for a trial upon the merits; it is not, perhaps, therefore necessary definitely to decide the constitutional questions argued at the bar, though their discussion and consideration were entirely proper and pertinent. There are other grounds made clearer by that discussion upon which the order may be affirmed. The order is affirmed with costs.

HUNT, J. (dissenting). This is an appeal from an order made at a Special Term, vacating a judgment in favor of the plaintiffs for $74,299.40, which was subsequently affirmed at the General Term of the first district. The action in which the judgment was obtained, was brought upon an award made by Judge BARNARD, Lieutenant-Governor Alvord and Mr. Waters, under the act of the legislature hereafter mentioned. In 1858, the Croton aqueduct board advertised for proposals for constructing certain gate houses upon their works, for which the plaintiffs made an estimate, and were adjudged by the board to be the lowest bidders for the work. The common council refused to award the work to the plaintiffs, who thereupon commenced several legal proceedings against the city to enforce their rights, one of which was an injunction restraining the city from giving the work to any other persons, and asking that the city be compelled to award the same to the plaintiffs. Proceedings were also instituted by the Attorney-General, and an injunction against the city procured by him. The progress of the city in building these works was effectually arrested, and the city applied to the legislature for the passage of an act enabling it to build

the works in question. Those representing the city and those representing the plaintiffs, met each other in this new arena, to which the contest had been transferred, and, after various negotiations, agreed upon the passage of the act of April 16, 1860. The city being thus relieved from its injunctions and legal obstacles, proceeded at once in the execution of its work. The plaintiffs took measures for proceeding in the arbitration, by calling upon the city to appoint an arbitrator, which was done by the mayor, and information thereof given to the corporation counsel, and by themselves appointing one on their part. The two thus selected chose a third; a long and laborious hearing was had before the arbitrators, extending through several months and including many meetings, which resulted in a large award in favor of the plaintiffs. Written notice of hearing was served upon the mayor, the comptroller and the Croton board, but they did not attend.

The report of the referees was filed and an order of the confirmation entered, and a certified copy of the report served upon the comptroller, and payment of the award was demanded. Not being paid, a mandamus was applied for nearly a year after to compel its payment, which was denied, on the ground that no money had been appropriated for the purpose. (37 Barb., 440.) Afterward, an action was brought upon the award, an answer was interposed by the corporation counsel, the issue was carried to the circuit, was repeatedly noticed for trial, and, when reached on the calendar, was refused by order of the court. It was tried at great length before the referee, summed up by both parties, a report made in favor of the plaintiffs, on which judgment was entered on the 13th of June, 1863. From this judgment no appeal was ever taken. Information of this judgment was communicated to the comptroller in July following, and at frequent intervals thereafter, when he was called upon for payment. On the 23d of July, 1864, the comptroller still neglecting to pay, an execution was issued upon the judgment. On the 23d of August, the present proceedings were instituted by the comptroller under the act of 1859 (p. 1173, § 5), on the ground

that the judgment had been obtained by collusion or founded in fraud.    The questions arise upon the act of April 16, 1860, which is entitled as follows :

" An act to facilitate the acquisition of land for a junction gate house, and to connect the same with the new reservoir and the city mains in the city of New York, and to provide for the settlement of claims for damages connected therewith."    Passed April 16, 1860, three-fifths being present. (Laws of 1860, p. 772.)

The first section of the act authorized the Croton aqueduct board, in behalf of the city of New York, to acquire title to a certain piece of land therein particularly described. Sections two and three contain provisions as to the mode of obtaining title and the appraisal of damages.    Section four authorizes the construction of a gate house upon the lands so acquired, the construction of several branch aqueducts, and the laying of pipes or mains, through the Central park, the purchasing of materials and the completion of the work in such manner as the public interests may require.    It proceeds in the following language : " And for the purpose of adjusting and determining the damages that the contractors to whom the gate house and aqueducts specified in this section were awarded by the Croton aqueduct board, on the 27th day of October, 1858, which they may be equitably entitled to recover of the city of New York, the same may be ascertained by three arbitrators, one of whom may be chosen by the mayor of the city of New York, and one by the parties claiming such damages, and the third shall be appointed by the two arbitrators chosen as aforesaid.".    The remainder of the section provides for the confirmation of the report and the payment of the amount thereof by the comptroller of the city.    The fifth section provides that sewers or drains shall be built upon each side of the said branch aqueducts and the sixth provides that when the aqueduct and sewers provided for shall be built, the portion of Ninety-second street authorized to be acquired shall be held by the city in the same manner as other public streets.    Section seven enacts that the act shall take effect immediately.

It is claimed that this act is void under the provisions of section sixteen, article three of the Constitution of this State, which is as follows : " No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title." Under this section of the Constitution three questions are presented : first, is this a "private or local bill ? " and, second, does it embrace more than one subject ? and, thirdly, is that subject expressed in its title ? It is by no means certain that the two questions first named can be answered affirmatively; in default of which the third question would not arise, and the law must be held free from objection under this constitutional enactment.

Preferring, however, to place my opinion on the third ground, I waive the discussion of the question whether the act in question is a private or a local bill. (1 Seld., 285 ; 2 Hill, 241 ; 3 Cow., 662 ; 14 Barb., 559 ; 32 N. Y., 377.)

In examining this act in its provisions and in its title, we find that the city of New York needed, for its Croton aqueduct department, the acquisition of certain lands; that it was necessary and was intended to build certain junction gate houses upon these lands, to connect them with the other mains or pipes in the city; and that certain claims for damages existed in relation to some or all of these subjects, which it was desirable there should be authority to settle in some manner different from that given or supplied by the general powers of the city corporation. There was, in the body and in the title of the act, a clear intimation that there was some provision for the settlement of damages, different from the ordinary mode of proceeding. Considering the corporation of the city of New York, either as a simple corporation or as a legislative body, it possessed the form of settling any claim for damages without the aid of this act. It could pay its debts, or it could be sued in the courts of law, and if any claim, legal or equitable existed against it, it could there be settled. An unusual provision was thus foreshadowed by the title. All the subjects-matter that I have named above are expressly referred to in the title of the

act and in the body of it.  By section four, the Croton
aqueduct board was expressly authorized to construct a
junction gate house upon the land acquired under this act,
and also to construct such gate houses for the new reservoir
through the Central park, as they should see fit, and this
was the same matter referred to in the title, by the words
"for a junction gate house."  By a subsequent portion of the
same section, provision was made for the payment of
damages to the contractors to whom the same gate houses
had been awarded by the same aqueduct board, at a previous
date, and in the title this matter was referred to by the
words, "and to provide for the settlement of claims for
damages connected therewith."  Claims for damages con-
nected therewith, only, would refer to claims already in
existence, as well as to future damages.

Section four provides for ascertaining and determining
such past claims only.  "Connected therewith," i. e. with
the acquisition of lands, or with the building of gate houses,
is applicable to the same subject, and embraces claims for
damages arising out of, or connected with the building of
such gate houses.  The claim of Baldwin & Jaycox was for
damages connected with the building of such gates.  They
claimed that, by a previous award, the Croton board had
entered into a building contract with them for the construc-
tion of those very gates, and that, the contract having been
finally awarded to another party, they were entitled to such
an amount of damages as would have accrued to them in
the form of profits had they been permitted to complete
such gates.  It would be hypercritical to say that this claim
was not fairly embraced within the language of the title
already quoted.  That it would be so embraced, and that
this settlement of damages is also incidental merely to the
main subject of the act, will appear by a reference to a few
authorities.

In *Brewster* v. *City of Syracuse* (19 N. Y., 116), an act
was passed entitled "An act for the relief of James Sey &
Son."  This act authorized the common council to assess
upon certain territory in the city of Syracuse and collect the

sum of $600, and to pay the same to James Sey & Son. The city of Syracuse had contracted with Sey to build a certain sewer, which he had completed according to the contract, and had received the full contract price. The city was by its charter prohibited from paying any compensation above the contract price, and could only do so by virtue of such special act. It will be observed that the title of this act conveyed no intimation, either to the citizens of Syracuse or to the members of the legislature, that power was given to tax the inhabitants of that city, or that that city or any of its inhabitants had the remotest concern in the passage of the act. An act, the title of which was for the relief of James Sey & Son, could communicate no such information to the astutest mind. Upon an objection that this law was in violation of the constitutional restriction under discussion, this court held the objection not well taken, that the levy and collection of the tax and the payment of the same to Sey & Son, were parts of the same subject. JOHNSON, Ch. J. said: "The general subject is expressed in the title. The degree of particularity with which the title of an act is to express its subject, is not defined in the Constitution, and rests in the discretion of the legislature. An abstract of the law is not required in the title, and its actual subject is in this law clearly and appropriately expressed."

In *The People* v. *The Supervisors of Orange* (17 N. Y., 285), the constitutional requisition that any law for the imposition of a tax should distinctly state the object to which it is to be applied, was held to be satisfied by the declaration that the money was to be paid into the treasury to the credit of the general fund, although such fund was applicable to any object which the legislature might deem proper. This decision ignored all the detailed purposes to which the money might be applied, such as expenses of the legislature, of the courts, of the annuities payable to. Indians, and a great variety of subjects referred to on the argument of that case. Although upon a different provision of the Constitution, this decision is clearly germane to the question before us.

In *The People* v. *McCum* (16 N. Y., 58), the act of 1855, chapter 337, entitled "An act to enlarge the jurisdiction of the General and Special Sessions of the Peace in and for the city and county of New York," came before the court. It was held that a provision enlarging the powers of the Courts of Oyer and Terminer and of Appeals was not invalid, although the title was restricted to courts in the city and county of New York.

In *Conner* v. *The Mayor, etc., of New York* (1 Seld., 285), the act in question was entitled "An act in relation to the fees and compensation of certain officers in the city and county of New York," and prescribed fixed salaries for the officers named. It further provided that all fees received by them should be paid into the city treasury. It was held that there was but one substantial subject of the bill, and that it was sufficiently expressed in its title.

In *Phillips* v. *The Mayor of New York* (1 Hilton, 483), the question arose upon the act of 1857, chapter 446, page 874, entitled "An act to amend the charter of the city of New York," in which various amendments were made to the charter of the city theretofore existing. Section forty-eight excluded the aldermen from acting as judges in the Courts of Oyer and Terminer, or General or Special Sessions, and provided who should hold those courts. Courts of Oyer and Terminer are constitutional courts, and it was claimed that they did not come within the idea of amendments to the city charter. Section fifty-two added two new crimes to the criminal laws of the State, which, it was argued, were not within the proper idea of amendments to the city charter. The court held otherwise on both propositions, and adjudged the act to be unobjectionable within the provision we are considering.

In *Mosier* v. *Hilton* (15 Barb., 657), the court considered the act of March 28, 1850, entitled "An act for the relief of the creditors of the Lockport and Niagara Falls Railroad company," which authorized the sale of the road and its franchises at public auction, and that the purchase-money should be applied to the payment of certain judgments named. The act contained further provisions authorizing the organization

of a new company from the purchasers, with the usual machinery of an election, the choice of directors, the filing a certificate under the secretary of state, and a declaration that, when so organized, the company should have the same powers and be subject to the same restrictions as the existing company. · It was claimed that this was a new and different subject, and that no intimation of it was conveyed by the title of the act. The court held that the provisions all related to the same general subject, the relief of the creditors, and that the act was valid. Many other cases to the same general effect are cited by Judge WELLES in his opinion below.

These references, I think, sustain the argument that the words in the title, " and to provide for the settlement of claims for damages connected therewith," includes a sufficient statement of, or reference to, the claim in question.

It is claimed that the section of the act of 1860, now in question, which provides for submission to arbitration of certain claims against the city for damages connected with the building of the junction gates, is also void as being in violation of article one, section two, of the Constitution of this State. · That article provides that " the trial by jury in all cases in which it has been heretofore used, shall remain inviolate forever," and also of section six of the same article, which provides that no person shall " be deprived of life, liberty or property without due process of law." This claim is not sound in my judgment.

First, the section in the act of April, 1860, is permissive simply, not mandatory nor even directory. The language is " for the purpose of adjusting and determining the damages that the contractors * * may be equitably entitled to recover of the city of New York, the same *may* be ascertained by three arbitrators," etc., not that they shall be so ascertained, not that the city shall be compelled to submit to that mode of trial, but that they may do so. The word " may " in a statute, means " must " or " shall " only in those cases where the public interests and rights are concerned, and where the public or individuals have a claim *de jure*, that the power shall be exercised. Here there is no

public interest that requires the exercise of the power, and no absolute right, on the part of any individual, that it shall be so exercised.  The public has no direct or immediate interest in the question, nor have the claimants a vested right to this mode of ascertaining the result of their claim.  In such cases, the entire current of authority makes the language permissive merely. (*Hutson* v. *The Mayor of New York*, 5 Seld., 163; *S. C.*, 5 Sand. S. C., 289; 1 Denio, 295; 3 Hill., 612; 5 Cow., 188; 3 Denio, 381; 22 Barb., 404; 5 Johns. Ch., 101; 10 How. Pr., 237.)

Another answer to this objection may be found in the fact alleged in the affidavit, that the persons acting on behalf of the city requested the adoption of the section under discussion, or at least expressly assented to its passage by the legislature; and that they subsequently accepted the benefit of the act in its other provisions, and voluntarily acted in regard to the arbitration in question.  It is certain that Baldwin & Jaycox made the claim in question, contending that it was valid, that they opposed at first the passage of the act, and afterward assented to it with the provision in question inserted.  It is certain also that they had commenced legal proceedings against the corporation, and had by injunction restrained them from building their junction gates, and that the corporation require legislative aid to relieve it from its embarrassment.

This act was then passed by the legislature enabling the city to proceed in the construction of its works in the manner it desired, and embracing a section authorizing a submission to arbitrators of claims like that of the plaintiffs, and intended to embrace their claim.

In consequence of this provision the legal proceedings were abandoned, the injunction was dissolved, and the city was enabled to proceed with its suspended work.

The act was upon the statute book in form of a valid statute, and the defendants accepted the offer to proceed as upon a submission under its provisions.  Assuming for the present that there was no compulsory power to submit to an arbitration, it was competent to the city to waive that point and

accept the approved mode of testing the claim made by Baldwin & Jaycox. This they did by the appointment of an arbitrator by the mayor acting in behalf of the city, and this arbitrator united in the selection of an umpire, and aided in the trial of the cause. It was competent to the legislature to authorize the mayor to appoint this arbitrator on behalf of the city. Some department of the city must act in this respect, and the mayor was as competent an organ as the common council or any other of the many agencies by which the city was accustomed to be represented. It is not permitted to a party both to accept and reject the subject of a choice. He may make his election, but is bound by it when made. Baldwin & Jaycox could not have taken a single step under the act of April, 1860, except by the concurrence of the city in appointing an arbitrator upon the nomination of the mayor. It was, therefore, entirely in the power of the city to reject the proffered mode of trial, had such been its wish. It apparently was not its wish at that time, and after having assented to the passage of the act and voluntarily adopted an arbitration as a suitable mode of determining the controversy, they cannot be permitted to say that such an arbitration is illegal. (*Havens* v. *Sackett*, 15 N. Y., 365; Story on Eq. Jur., § 1075, *et seq.*)

The plaintiffs gave formal notice of hearing before the arbitrators to the mayor, to the Croton department and to the comptroller, and the first named official communicated the fact of such notice to the then corporation counsel. If not precluded by the appointment of an arbitrator, here was another point, at which the defendants were called upon to express their disapprobation of the purposed mode of proceeding by arbitration if it did not meet their approbation. A motion that the notice of hearing should be vacated and the proceedings stayed would have been in accordance with the practice in such cases, and should have been adopted if the defendants intended to repudiate that mode of proceeding. They did not, however, take such action.

They also allowed the plaintiffs to proceed with a laborious and expensive trial, the result of which was a large award

against the city.   This was confirmed upon notice to them.
No objection was yet made to the arbitration, that it was
illegal, compulsory or not acceptable to them.

They were officially and repeatedly called upon for the
payment of this large sum, thus removing all doubt as to
their knowledge, and no objection was still made to the arbi-
tration, as to its results.

The plaintiffs, being unable to obtain the payment of their
award, commenced a proceeding by mandamus to compel its
payment, but the court declined to direct the issuing of the
writ.   Here is the first objection on the part of the defend-
ants that I have been able to find that the trial had been had
by arbitration, and that this mode of proceeding was uncon-
stitutional.

An action was then commenced upon the award, the papers
were served regularly upon the defendants, a defense inter-
posed, the case goes to the circuit, and then to a referee, the
formal proceedings of a trial take place, and a recovery is had
in favor of the plaintiffs.   It does not appear that, in this
action, the city objected to the law in question, or to the
appointment of an arbitrator under it.   If it had so objected,
the decision would probably be now held as *res judicata*
against them.   The judgment sought to be vacated was
recovered against the city in the suit last named.

During all this time, and for a period of one year and two
months after the entry of this judgment and notice thereof
to the city, no complaint was made, either of the form of the
proceeding or its result.   The present application is then
made, to vacate the award and the judgment, on the ground
that they were obtained by fraud and collusion ; and no facts
are now shown that were not known to the moving party
more than a year since.   After this lapse of time, and with
these repeated opportunities of interfering, both as to the
constitutionality of the law, as to the form of the proceeding ;
and upon the merits, by appearance before the arbitrators and
the referee, and by motion, and by appeal ; now to vacate the
award and judgment on the ground of the unconstitutionality
of the law of 1860 in directing an arbitration, would be in vio-

lation of all just rules and principles. The defendants must be held to have adopted and assented to the act in question, and to all its provisions. They are precluded from now objecting to them.

Again, assuming that the constitutional provision which we are considering would prevent a compulsory submission as between individuals, it does not follow that such submission might not be compelled as against the city of New York. That body exists in a twofold capacity, as a simple corporation merely, authorized to make contracts and liable for their breach, and in the more enlarged capacity of a legislative body, acting and holding their property as trustee for the people of the city of New York, and subject to the control of the people of the State through their legislative authority. In the language of Judge WELLES: "The defendants are a municipal corporation, constituting a branch or portion of the government of the State, as applied to the city of New York, invested with certain legislative, municipal and administrative powers, as defined in its charter, which is a grant of political power, creating a civil institution, to be employed in the administration of the government. In the case of *Underwood v. Dartmouth College* (4 Wheat., 518), WASHINGTON, J., said that there were two kinds of corporations aggregate, to wit, such as were for public government, and others of a private character. That the first are for the government of towns, cities or the like, and, being for the public advantage, are to be governed according to the laws of the land. These he said were mere creatures of public institution, created for the public advantage. Such corporations derive their existence and all their powers from the legislature, and hold all their franchises in subordination to the power which creates them, and subject at all times to legislative interference and control; and in regard to the property held by the corporation, the corporate body is the trustee for the people, represented by the supreme legislative power. The legislature, therefore, in the exercise of such supreme power, may constitutionally direct, in relation to such property, as perfectly as it can dispose of property

owned by the State as such.   *   *   *   The parties were in reality only the State, and the plaintiffs. It is true, the tax payers of the city were interested; but when the State interferes in an act of government, and as a question of power, the people of the whole State, represented by the legislature, become the only party besides the plaintiffs, and it was therefore competent for it to pass this law, without the assent of the city or its corporation."

In *Darlington* v. *The Mayor of New York* (31 N. Y., 164) the third proposition of the head-note is in these words: " The property owned by the city corporation is held by it as a public corporation, and is subject to the law-making power of the State, vested in the legislature. It seems that property held by the corporation for public use is not subject to levy and sale on execution. But property not held in trust for such use may be thus subject."

That action was brought against the city under the act for compensating parties whose property may be destroyed by mobs or riots, passed April 13, 1855, and the plaintiff proved the destruction of his property by a riotous assemblage in July, 1863. The defendant moved for a nonsuit, on the ground that the effect of the act was to deprive the defendants of their property without due process of law, and that it was therefore unconstitutional and void. The court below nonsuited the plaintiff. This court reversed the judgment of nonsuit and held the law to be constitutional and valid. The third point of the defendant's argument before this court embraced the proposition that the defendants were possessed of private property, which they hold and enjoy upon the same tenure as if it had belonged to an individual; and that, as respects their private property and its disposition, the defendants are as free from legislative control and interference as is any private individual in the possession and enjoyment of his property. It was then argued that the act in question created a debt against the city without their consent, charged their private property with its payment, and in effect transferred the private funds of the defendants, without their consent, to the individual sufferers from the

riots. The plaintiffs' counsel, on the other hand, claimed that the money or property in the hands of the treasurer was public money, for public purposes, to be defined by the legislature of the State, or by subordinate bodies under a power delegated by the State; that it was a municipal corporation, and that every dollar of its property was public property which the legislature would have the right to appropriate to any public purpose in the city of New York that it should deem proper. That it was a trustee for specific purposes, with no powers and no rights but in the execution of its trusts. This court sustained the position of the plaintiffs, and held that the property was not private property within the meaning of the Constitution (p. 193), that, though the title was vested in the corporate body from motives of convenience, it was entirely competent for the legislature to direct their property to be sold and the proceeds applied to any public or municipal purpose within the city. In support of their view the court enter into an elaborate examination of the authorities, citing, among others, *Woodward* v. *Dartmouth College* (4 Wheat., 518); Story on Cons., § 1, p. 387; 2 Kent's Com., 275; *Roosevelt* v. *Draper* (23 N. Y., 318); *Bailey* v. *The Mayor* (3 Hill, 531; *S. C.*, 2 Denio, 433); *Guilford* v. *Clinger* (3 Kern., 143).

In *The People* v. *Pinckney* (32 N. Y., 377, 393), the court, DAVIS, J., delivering the opinion, reiterates the same idea in these words: "The power of the legislature of the State is supreme over that of all local legislatures, except when the Constitution intervenes to restrict it. The corporation of the city is not an officer, within the meaning of the tenth article. To diminish or restrict its general legislative or administrative power as a body corporate is not to abrogate or change a public office in the sense of the constitutional restriction. The legislature may recall to itself, and exercise at its pleasure, so much of the powers it has conferred upon the city corporation, as are not secured to it by the Constitution. This necessarily results from the fact that all the legislative power of the people is granted to the legislature, except such as is expressly reserved."

It is upon the same principle that the legislature have, for many years past, claimed and exercised the entire control over the streets of the city of New York, designating where city railroads may be built, and excluding the occupation of the streets from that employment as their judgment dictated. (*The People* v. *Kerr*, 37 Barb., 357; *S. C.*, 27 N. Y., 188; *Milhau* v. *Sharp*, SELDEN's opinion, Daily Tribune, March 21, 1864.)

In the case of *The People* v. *Kerr* (27 N. Y., 188), it was held that the fee of streets acquired by the city of New York, under the act of 1813, is held by it in trust for the public use of all the people of the State, and not as corporate or municipal property. It was decided, in the same case, that, such property being acquired by the exercise of the right of eminent domain, and the trust of the city being *publici juris*, it is under the unqualified control of the legislature, and any appropriation of it to a public use by legislative authority is not a taking of private property, so as to require compensation to the city to render it constitutional. Upon well established principles, and by these recent express ·adjudications, I am of the opinion that the fourth section of the act in question, upon the supposition that it requires and compels a submission to arbitration, is still legal ·and valid.

I have not thought it necessary to examine the question of whether the plaintiffs had a valid legal or equitable demand against the city. It is sufficient for my purpose that they claimed to have such demand. Neither have I given much consideration to the *ex parte* affidavits of the defendants, seeking to show that the plaintiffs had in fact suffered no damage, but had escaped a great loss by being deprived of their contract. The respectable referees, after a protracted examination, held otherwise, and they must have had at least ordinary proof of the facts on which they based their decision. They acted not only under the sanction of their oaths, but under the higher safeguards of their reputation as intelligent and high-minded gentlemen.

The present proceeding is instituted by the comptroller, in opposition to the wish of the law department of the city, by virtue of the statute authorizing him to take such proceeding to vacate a judgment obtained by fraud or collusion. As to who the parties are that have perpetrated a fraud, we are not informed by the affidavit. It is natural to suppose that the plaintiffs are intended as the persons to whom fraud is to be imputed, or with whom collusion occurred. No act, however, of the plaintiffs is pointed out as fraudulent, nor is any suggestion made as to the persons with whom they colluded. If they were the parties obtaining the passage of the act of April, 1860, if done by proper means; if they appointed their arbitrators; prosecuted their trial; demanded their pay; applied for a mandamus; sued their award; issued their execution; employed counsel, there is nothing in all this that would not have been done by honest and pure-minded men, who had, or supposed they had, a just claim against the city.

Neither is there any indication of the persons colluded with on the part of the city. The mayor, Judge Bronson, or Mr. Develin, were the persons most directly brought into connection with the plaintiff, but there is not an intimation that either of these officials violated his duty by colluding with the plaintiffs. If the moving party does not know upon whom to charge the fraud or collusion, or is not willing to make the charge, he ought not to expect the court to seek out such information as to make such charge in his behalf. I think the judgment should be reversed.

Affirmed on the ground that the order appealed from was in the discretion of the court below.